MYERS, APPELLEE, *v.* GARSON, APPELLANT, ET AL.

[Cite as *Myers v. Garson* (1993), 66 Ohio St.3d 610.]

(No. 92–868—Submitted April 28, 1993—Decided July 7, 1993.)

*Brouse & McDowell, Linda B. Kersker* and *David B. Nolin,* for appellee.

*Skidmore & Associates Co., L.P.A., Archie W. Skidmore* and *Spiros Vasilatos, Jr.,* for appellant.

A. WILLIAM SWEENEY, J. Preliminarily, appellant Garson essentially contends that the decision by the court of appeals was tainted because Judge John W. Reece did not recuse himself from the appellate panel below, since at an earlier state of the present litigation, Judge Reece had in fact recused himself from hearing the action while he was sitting as a trial judge.[1] While one can perhaps argue that Judge Reece should have disqualified himself from sitting on the appellate panel below given his prior recusal, we remain unpersuaded because appellant raised no objections until after he had obtained an adverse decision from the court of appeals. In our view, appellant had several opportunities to object to the presence of Judge Reece on the court of appeals panel; however, no objection was raised in a timely manner. As noted by the court of appeals upon appellant's motion for reconsideration, appellant could have contacted the court to discover Judge Reece's presence on the appellate panel after appellant had waived oral argument, but he neglected to do so. Therefore, we reject appellant's hollow assertions that Judge Reece's involvement with the decision below somehow prejudiced his reliability or impartiality.

With respect to the determinative issue in this appeal, appellee Myers argues, *inter alia,* that the court of appeals merely followed the dictates of App.R. 12(B) by "render[ing] the judgment or final order that the trial court should have rendered." It is appellee's contention that the court of appeals below did not substitute its judgment for that of the trial court, but simply corrected a legally insupportable judgment of the trial court by finding that a novation took place between the parties.

We have reviewed the extensive record developed during this protracted litigation and find persuasive arguments and elements supporting the reasoning of the court of appeals below. However, as we have often noted in the past, where the decision in a case turns upon credibility of testimony, and where there exists competent and credible evidence supporting the findings and conclusions of the trial court, deference to such findings and conclusions must be given by the reviewing court. See *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 80, 10 OBR 408, 410, 461 N.E.2d 1273, 1276; and *Cohen v. Lamko, Inc.* (1984), 10 Ohio St.3d 167, 10 OBR 500, 462 N.E.2d 407. In addition, this court has held that a reviewing court is not authorized to reverse a correct trial judgment merely because erroneous reasons were assigned as a basis therefor. *Agricultural Ins. Co. v. Constantine* (1944), 144 Ohio St. 275, 284, 29 O.O. 426, 430, 58 N.E.2d 658, 663.

---

1. As conceded by counsel for appellant during oral argument, there is nothing in the record indicating the reason why Judge Reece recused himself from sitting on this case as a trial judge. Thus, there is nothing in the record to indicate that Judge Reece was duty-bound to recuse himself from the panel in the court of appeals below.

As this court observed in *Seasons Coal, supra,* 10 Ohio St.3d at 80, 10 OBR at 410, 461 N.E.2d at 1276: "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony."

While it is true that the trial court decision of June 17, 1991 was based on the resubmission of the pre-existing trial court record, it is also true that all the pertinent trial court proceedings in this cause were presided over by the same trial judge.

The appellate court below and appellee herein emphasize that the trial court had specifically found that appellee, as of March 23, 1970, "was to recover 50% of the profits from the ultimate disposition of the property," but concluded that appellee was not entitled to any profits from the sale of the property in issue. While the finding of the trial court in this respect does indeed appear to be inconsistent with its ultimate holding, the particular circumstances and course of dealings between the parties, as set forth in the record, while not explicitly set forth in the trial court's 1991 decision, arguably support the trial court's conclusion. For example, although the trial court made no specific findings as such, appellee's refusals to advance further funds to appellant between 1970 and 1976 could be characterized as breaches of the parties' agreement that profits be divided equally, and thus would not entitle appellee to any profits from the ultimate disposition of the subject property. In addition, there was sufficient evidence in the record to support the apparent conclusion of the trial court that the profit-sharing agreement between the parties, contemplated profit sharing only with respect to Phase I of the Bathcrest Estates development. Since Phase I yielded no profit, appellee would be entitled to no profit from the disposition of that property. Moreover, profits from the land development were not realized until the sale of Phase II of the development, and Phase II was not completed until after 1979 when the parties could not reach any agreement whatsoever.

In any event, the court of appeals below went beyond its prerogative as set forth in App.R. 12 and did not accord due deference to the judgment of the trial court. In effect, the appellate court substituted its judgment for that of the trier of fact. While the court of appeals' finding of a novation between the parties appears somewhat persuasive when viewed in an after-the-fact context of what would have been most advantageous from appellee's standpoint, the record is devoid of any substantial evidence to support such a finding.

Thus, we reaffirm our prior reasoning in *Seasons Coal, supra,* and hold that an appellate court must not substitute its judgment for that of the trial

court where there exists some competent and credible evidence supporting the findings of fact and conclusions of law rendered by the trial court. Upon a careful review of the instant record, we find there was competent and credible evidence supporting the judgment of the trial court and, therefore, that judgment must be reinstated.

Notably, the cause *sub judice* amply points out that different persons can arrive at different conclusions in a case based on the same evidence. If nothing else, the protracted history of the instant cause unquestionably underscores the proposition that parties to an agreement should protect their interests by reducing all of their understandings to writing. So-called "gentlemen's agreements" not totally put in writing can become shaded or altered in the minds of the contracting parties over time, when changed circumstances and/or faulty memories make it more advantageous to assert a different meaning to an agreement than that which was originally intended. The vagaries of the legal system cannot guarantee that the "true" understanding of each of the parties is the one that ultimately becomes the agreement to which they are legally bound.

Based on all the foregoing, we reverse the judgment of the court of appeals and reinstate the judgment of the trial court.

*Judgment reversed.*

MOYER, C.J., DOUGLAS and RESNICK, JJ., concur.

WRIGHT, F.E. SWEENEY and PFEIFER, JJ., dissent.

WRIGHT, J., dissenting. Not long ago a majority of my colleagues declared that we sit as a court of equity. See *State v. West* (1993), 66 Ohio St.3d 508, 613 N.E.2d 622. I cannot agree with such a premise; however, I do believe we should apply common business sense to cases involving commercial transactions. We certainly failed in this respect today.

Stripped of irrelevant matters, the facts show two men entering into a real estate development enterprise nearly thirty years ago. Over the years Myers put up $107,000 while Garson negotiated the sundry deals. The two men came to a parting of the ways in 1979. Myers quitclaimed his interest in the property to Garson. Garson, in turn, accepted the property, offered $307,000 in consideration thereof, and continued the enterprise. Garson set aside the $307,000 as an account payable to Myers.[2]

---

2. The court of appeals explained the pertinent facts more clearly than did the majority:

This litigation began in 1984 and led to a court of appeals' holding that the financier, Myers, was entitled to $307,000 plus interest. The court held that the enterprise ended in 1979 and Myers was not entitled to profits earned subsequent to that date. The court below called this relatively simple deal a "novation." My colleagues in the majority have rejected this appellation in order to reach a contrary result.

Incredibly, by our pronouncement today, the former partner now owes $107,000, which is about a third of the debt he expressly acknowledged in writing nearly fourteen years ago. Did reason prevail here? I think not. We wonder why folks criticize the courts. As Justice Robert H. Jackson once bemoaned: "I give up. Now I realize fully what Mark Twain meant when he said, 'The more you explain it, the more I don't understand it.' " *Securities & Exchange Comm. v. Chenery Corp.* (1947), 332 U.S. 194, 214, 67 S.Ct. 1760, 1762, 91 L.Ed. 1995, 2008 (Jackson, J., dissenting).

I dissent from this unreasonable and seemingly ludicrous result.

PFEIFER, J., dissenting. Forrest Myers thought he had a simple problem when he filed suit in 1984 to unwind a real estate development venture he entered into with Harold Garson in 1965.

Judge Sheila G. Farmer, after weighing the evidence, provided a reasonable solution: an equal division of profits after return of capital to the parties. Unfortunately, Judge Farmer, on remand, then decided to proclaim the legal status of the relationship as being terminated. Almost a decade later Forrest Myers has seen this dispute through two trial judges, two passes through the Summit County Court of Appeals and one review by the Supreme Court. Given all that legal scrutiny, the specific legal status of the Myers–Garson

---

"The trial court's determination that Myers and Garson rescinded their original agreement in 1979 is warranted by the record. However, there is no support for the conclusion that Myers intended to abandon his share of the profits from the fourteen year endeavor and simply accept a return of his investment. Rather, the evidence indicates that the parties believed Myers had sold his interest in the Bathcrest project to Garson for $307,000.

"Myers never expressly rejected Garson's offer to buy out his share. Instead, he quitclaimed his interest in the real estate to Garson, consistent with the proposal. Myers' correspondence of July 12, 1979 to Garson's attorney accompanying the deed acknowledged the $200,000 to be paid in addition to the return of his original investment [of $107,000]. Verification of this amount was requested. Elizabeth Thompson, Myers' assistant, forwarded a letter dated July 23, 1979 on Myers' behalf inquiring as to when the $200,000 was to be paid. Garson proceeded with the remainder of the project, he testified, believing an agreement had been reached. A sum of $307,000 was set aside in an account for Myers. Myers completely discontinued his participation in the endeavor and did nothing in the next five years to dispel Garson's understanding that he was on his own. Indeed, a letter from Myers to his son dated June 19, 1983 suggests that Myers was under the impression that Garson owed him $200,000. In any event, Myers did not once demand performance upon the original pre–1979 agreement until *after* Garson had realized a substantial profit on the completed project." (Emphasis *sic*.)

business venture has yet to be identified. The reviewing courts have been quick to tell the parties what their business relationship was not, but reticent to announce what it was.

Instead of providing a reasonable winding up of this business and an end to the dispute, reviewing courts have lost their way—wandering about in search of legal theory.

The trial court was correct the first time—then on retrial misunderstood what the court of appeals apparently expected her to do. Judge Farmer crafted the appropriate remedy the first time she weighed the evidence. We should reinstate her first judgment entry—a division of the profits after a return of original capital to the parties.

Judge Farmer, before the first appeal, had the opportunity to assess the issues that might warrant some result other than that the parties agreed to an equal division of the profits. If the project failed, had Myers avoided potential future liability by quitclaiming the property to Garson? Was Garson forced to invest personal funds that should have been contributed by Myers? Did Garson have to devote more of his own time and development expertise to complete the project as a result of Myers' effort to terminate? Or did the quit-claim deed by Myers simply facilitate Garson's ability to expedite the documents necessary to complete the financing and subsequent sale of individual home sites?

All the above matters and many others were before Judge Farmer when she initially tried the case. Upon consideration of all the evidence, the history of the relationship between the parties on prior projects as well as the specific details of this venture, the trial court decided the case.

The admonitions of the majority to the court of appeals are appropriate in this case; however, after offering advice, the majority reinstates the wrong decision of the trial court. This leaves Forrest Myers, after having risked $107,000 in 1965, and after almost a decade of litigation, with no part of the $1,353,861 in profits from the development, no interest on the original investment until 1979, and with legal fees most probably sufficient to wipe out the funds awarded under this court's holding. Talk about a haircut!

WRIGHT, J., concurs in the foregoing dissenting opinion.