On May 29, 1998, appellants, Robert L. Swank and E. Clark Swank, filed applications to appoint guardians for their parents, appellees, Freeman J. Swank, Sr. and Rheabelle Swank, on the basis that appellees were incompetent. Appellees also have a third son, Freeman Swank, Jr. Basically this case involves the disposition of the family farm to one son, Freeman Jr., over the two others, appellants.
A hearing was held on May 22, 1998. By entry filed June 2, 1998, the trial court denied the applications.
On June 16, 1998, appellants filed a motion for new trial. By judgment entry filed July 2, 1998, the trial court denied said motion. Also on July 2, 1998, the trial court filed findings of fact and conclusions of law.
It should be noted appellants also sued appellees in a civil action, Case No. 97-11-H. In said case, appellants moved to disqualify appellees' counsel because appellees' counsel also represented Freeman Jr. The civil trial court denied this motion. The trial court sub judice took judicial notice of this decision. See, Finding of Fact No. 9 filed July 2, 1998.
Appellants filed an appeal and this matter is now before this court for consideration. Assignments of error are as follows:
I
 THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN EXCLUDING PROBATIVE EVIDENCE THAT THE PROSPECTIVE WARDS REQUIRED LIMITED GUARDIANS BECAUSE THEY WERE "MENTALLY IMPAIRED" IN THAT THEY WERE NOT TAKING AND COULD NOT "TAKE PROPER CARE" OF THEIR MAJOR PROPERTY INTERESTS.
II
 THE TRIAL COURT ERRED IN CONCLUDING THAT EVIDENCE THAT A PROSPECTIVE WARD'S DISSIPATION OF MAJOR PROPERTY INTERESTS RESULTING "FROM UNDUE INFLUENCE OR DURESS OR FROM LACK OF KNOWLEDGE" DOES NOT CONSTITUTE EVIDENCE THAT THE PERSON IS "MENTALLY IMPAIRED."
III
 THE TRIAL COURT ERRED IN FINDING THAT THE PROSPECTIVE WARDS HAD COMPETENTLY APPROVED A SO-CALLED "FINANCIAL RECOVERY PLAN" STRUCTURED BY THEIR TRUSTED SON, THEIR ATTORNEYS (WHO ALSO REPRESENTED THE CONFLICTING INTEREST OF THE SON) AND THEIR BANKER (WHO WAS A SUBSTANTIAL CREDITOR OF BOTH THE PROSPECTIVE WARDS AND THE SON) WHICH TRANSFERRED TO THE TRUSTED SON ALL THE PROSPECTIVE WARDS' NET WORTH AND RENDERED THEM INSOLVENT.
IV
 THE TRIAL COURT ERRED IN ALLOWING COUNSEL WHO REPRESENTED THE BENEFITTING SON IN THE "FINANCIAL RECOVERY PLAN" TO REPRESENT THE PROSPECTIVE WARDS WITHOUT MAKING A RELIABLE DETERMINATION THAT THE CONFLICTING INTERESTS REPRESENTED BY SUCH COUNSEL DID NOT DISQUALIFY HIM OR OTHERWISE UNDERMINE THE INTEGRITY OF THE LIMITED GUARDIANSHIP APPLICATION PROCEEDINGS.
 I, II, III
These assignments of error challenge the trial court's decision in finding appellees competent and in finding no clear and convincing evidence of any mental or physical illness or disability or any mental impairment. Appellants claim the trial court erred in denying their requested guardianship over appellees. We disagree.
The thrust of appellants' argument is that their parents are incompetent to manage their own affairs even though there is no proof of any mental or physical illness or disability or mental retardation. Appellants claim a request for a "limited guardianship" does not require proof of any mental or physical illness or disability but only requires proof of their parents' inability to take proper care of their property and assets. The natural result of this hypothesis is to read R.C. 2111.01(D) in the disjunctive. We disagree R.C. 2111.01(D) is to be read in the disjunctive. Said section defines an incompetent person and states as follows:
 (D) 'Incompetent' means any person who is so mentally impaired as a result of a mental or physical illness or disability, or mental retardation, or as a result of chronic substance abuse, that the person is incapable of taking proper care of the person's self or property * * *. (Emphasis added.)
Not only does the plain reading of the emphasized portions argue against such a hypothesis, but the case law also refutes that incompetency can be established without evidence of mental or physical illness or disability. In In re Bolander (1993),88 Ohio App.3d 498, 502, our brethren from the Eleventh District discussed the necessity of reading the 1990 amended statute inpari materia with the prior version, holding "[u]nder the new definition, though, a trial court must find that the person is mentally impaired before it can ultimately conclude that she is incompetent." Further, before a guardian can be appointed there must be clear and convincing proof that the proposed ward is incompetent. In In re Guardianship of Rudy (1992), 65 Ohio St.3d 394,396, the Supreme Court of Ohio noted under R.C.2111.02 findings of medical problems, the need for assistance to live and vague findings that the proposed ward was "misinformed" did not meet the stringent "best interests" test of the statute.
We must now turn to an examination of the record to see if it supports the trial court's decision there was insufficient evidence of incompetency that is, whether there was evidence of mental or physical illness or disability rendering appellees unable to care for their property.[1]
A judgment supported by some competent, credible evidence will not be reversed by a reviewing court as against the manifest weight of the evidence. C.E. Morris Co. v. FoleyConstruction Co. (1978), 54 Ohio St.2d 279. A reviewing court must not substitute its judgment for that of the trial court where there exists some competent and credible evidence supporting the judgment rendered by the trial court. Myers v.Garson (1993), 66 Ohio St.3d 610.
Appellants argue the undue influence of their brother, Freeman Jr., is evidence of their parents' mental impairment,[2] and the trial court erred in finding appellees were competent when they approved a "financial recovery plan."
By Findings of Fact Nos. 3, 4, 7, 10 and 11 filed July 2, 1998, the trial court specifically found the following:
 3. Freeman Swank, Sr., is in ill physical health but is receiving appropriate medical care. Rheabelle Swank appears to be in good physical health. The Swanks are adequately performing the usual day-to-day living functions.
 4. The Swanks appeared at the hearing and, on cross examination, answered responsively to all questions put to them.
 7. The Swanks testified that they are content with the actions taken by Freeman Jr., their attorney, and their banker prior to and during the ongoing litigation in Case No. 97-11-H.
 10. No evidence was presented of a mental or physical illness or disability that has resulted in either Swank being mentally impaired.
 11. No evidence was presented that either Swank is mentally impaired.
From these findings, the trial court found appellees to be competent, concluding as follows:
1. The Swanks take proper care of themselves.
 2. The Swanks properly receive and disburse their income and properly transact ordinary day-to-day financial transactions.
 3. The Swanks are competent to retain an attorney of their choice and to weigh and waive conflicts of interest that may exist between them and their son, Freeman Jr.
The report of the Probate Court investigators filed May 18, 1998 concluded guardianship was not recommended:
 As previously stated, both Freeman Sr. and Rheabelle appear very alert. The pay their own bills. Freeman Sr. is active on the Richland County Fair Board, and approximately two years ago, he started an antiques club in Richland County. They said they want to start a petting zoo on the farm they live in and purchased two small donkeys named Bruno and Cable.
 Freeman Sr. had been treated at the Cleveland Clinic with pancreatic cancer; however, he said his doctor said his cancer is now in remission but his post chemo treatments have affected his heart.
 Both Rheabelle and Freeman Sr. said they are happy with the way things are today.
 As previously stated, from what we observed, we cannot recommend guardianship at this time.
The guardian ad litem observed the following:
 Respondent related that he is satisfied with Jay [Freemen Jr.] having control of the farm. It solved his two main worries. He no longer needs to worry about the farming operations. He has some assurance that the farms are out of danger of passing out of the Swank family. He is also assured of a place to live. He is enjoying the prospect of developing some entertainment facilities on the farm properties.
 See, Report of Guardian ad Litem filed May 19, 1998.
When appellees testified, they were able to explain the financial plight their farming operation faced including outstanding mortgages and accounts. They understood the nature of the debt to their son Freeman Jr. and the recent amendment to a purchase option assuring them of a life estate in the farm they now occupy. Civ.T. at 30-31; T. at 29-32, 34. During their testimony, appellees responded appropriately and appeared aware of the nature of their previous financial problems and the present arrangements. During the Probate Court hearing at 35, appellee Freeman stated the following:
 Q. Did you ever have any discussion with anybody, as to whether or not — as to what the tax implications would be?
A. No.
Q. The subject never came up?
 A. No. Never discussed it because — Your Honor, can I make a statement? You know, I've — really happy the way my older son has helped us out, and I only wanted the dairy farm and where we live, and I mean, what do I have to do? And he made it (inaudible) on the farms and no rent and no taxes, no payments and (inaudible) off my mind.
An attorney from Knox County, James Cullers, told of his February 1998 meeting with appellees wherein he questioned them extensively about their new wills. Civ.T. at 66-72. Attorney Cullers opined that in February of 1998, appellees knew what they were doing and why they were doing it. Civ.T. at 67-68.
Appellants' witnesses, Robert and Barbara McConkie and Dennis VanHouten, made much of an incident in 1997 where appellee Freeman was upset with his son Freeman Jr. and felt "kidnapped and imprisoned" when forced to continue a discussion on bankruptcy. Civ.T. at 101, 104-105, 123. In rebuttal, Freeman Jr. explained the incident. Civ.T. at 138-141. Clearly a decision on which version was more credible rests with the trial court.
As noted by the trial court, there was no medical testimony of any mental or physical illness or disability.[3] The only testimony offered on instability was the 1997 incident where a logical explanation was tendered. Given appellees clear and convincing testimony explaining their actions and decisions, we cannot say the trial court erred in finding no proof of incompetency. Balancing financial decisions or favoring one son over the two others based upon specific reasons is not tantamount to incompetency.
Assignments of Error I, II and III are denied.
 IV
Appellants claim the trial court erred in not addressing a conflict of interest wherein the attorney who represents Freeman Jr. also represents appellees. We disagree.
The trial court specifically found the conflict issue was handled in Case No. 97-11-H. T. at 9; Finding of Fact No. 9.
Despite appellants' objections, the evidence of Attorney Cullers established appellees were capable of making this decision on their own. Civ.T. at 68. Also, we are unable to review whether this issue is subject to res judicata without the full record and transcript of Case No. 97-11-H.
Assignment of Error IV is denied.
The judgment of the Court of Common Pleas of Richland County, Ohio, Probate Division is hereby affirmed.
By Farmer, J., Wise, P.J. and Gwin, J. concur.
---------------------------
---------------------------
 --------------------------- JUDGES
For the reasons stated in the Memorandum-Opinion on file, the judgment of the Court of Common Pleas of Richland County, Ohio, Probate Division is affirmed.
---------------------------
---------------------------
 --------------------------- JUDGES
[1] We note the record includes a transcript of the May 22, 1998 hearing in Probate Court and a partial transcript from the civil case, Case No. 97-11-H. The latter transcript was admitted in the Probate Court hearing as an exhibit and will be referred to as "Civ.T."
[2] We note "mental impairment" is not a consideration in the statutory definition of incompetency.
[3] Appellee Freeman suffers from pancreatic cancer and the aftereffects of chemotherapy on his heart.