OPINION
On July 21, 2000, Defendant-Appellant Randall J. Johnson was indicted on one count of rape of a child under the age of thirteen. Following a bench trial on February 6th and 7th of 2001, the trial court found Johnson guilty of this charge and later sentenced him to seven years in prison. Johnson has appealed his conviction, raising the following assignment of error:
 Appellant's conviction for rape was against the manifest weight of the evidence.
From approximately February of 1997 to April of 1999, Johnson was romantically involved with the victim's mother. Johnson, the victim and her mother initially lived together with the mother's sister, then moved into a hotel. Eventually, they moved into a residence in Troy, where the first alleged incident occurred in approximately the beginning of the summer of 1998. The victim, who was eleven years old at the time, claimed that, while watching television with her mother and Johnson in their bedroom, she witnessed Johnson "playing with himself" and staring at her. She woke her mother to tell her she wanted to go to her own room. After she was asleep in her bed, Johnson came in and woke her up, telling her to remove her underwear and to "be ready" in the morning. The next morning after her mother had left for work, Johnson came into her bedroom, put his hand over her mouth, and walked her back into his bedroom. Once there, he fondled her breasts, and she began to cry. He then told her it was time to go to school. This same series of events was repeated the following morning.
During the summer of 1998, Johnson's twins from another marriage stayed at the residence. They were a few years older than the victim. According to the victim, no abuse occurred over that summer while the twins were there. It is unclear whether the two incidents of breast fondling occurred before or after the twins arrived. Also over that summer, the family moved into a new residence in Piqua, and Johnson was off of work for approximately six weeks recovering from knee surgery.
Once the twins had gone back to their mother's and the victim had gone back to school, another incident allegedly occurred. During the time period of the alleged rapes, the victim's mother left for work at approximately 5:30 A.M. The victim awoke on one particular morning to find Johnson trying to remove her panties. When she tried to fight him, Johnson choked her, hit her in the face, and hit her head on the ground. After she was subdued, he forced her to have sex with him. She testified that it had been painful and had caused a small amount of bleeding. After the incident, the victim went to school.
According to the victim, similar incidents occurred over the next nine to ten months, for a total of approximately fifteen to eighteen episodes. When she put up a fight, he beat her, sometimes with a belt, sometimes with his fists, leaving busted lips and bruises. One time Johnson had forced her to perform oral sex on him, and another time he had raped her anally because she had a vaginal infection. When asked on cross examination, the victim agreed that during the vaginal rapes, Johnson had penetrated her "all the way."
The victim testified that Johnson had ejaculated almost every time, usually into his hands or onto her stomach. One time, she claimed, he had used a condom that her mother had poked holes into. Still, he had removed his penis from her before ejaculating. She had known her mother had poked holes in the condom because her mother told her she had found it in his wallet and had thought he was having an affair. However, the victim's mother testified that she had not told the victim about this condom until after the couple had separated.
The victim's friend also testified at trial. The friend testified that she had confided in the victim that she had been raped by her stepfather and he had been sent to prison as a result. Sometime later, the victim told her friend about Johnson abusing her. The friend had noticed bruising and busted lips on the victim almost every week. In addition, she was at the victim's house one day when the victim and Johnson were arguing. During this argument, she heard Johnson say, "Next time I'll put it in your ass."
Johnson moved out of the residence in approximately April of 1999, which also purportedly ended the abuse. It was not until March 26, 2000 that the rape allegations surfaced. According to testimony from the victim and her mother, the victim had told her boyfriend about the abuse. Her boyfriend had told his cousin, who in turn told the victim's pastor. The pastor apparently questioned the victim about the allegations and she admitted they were true. The pastor accompanied the victim home and together they told her mother. The police were called that same evening.
Johnson also testified. He explained that, during part of the time period these rapes allegedly occurred, he left for work at approximately the same time as the mother. He did concede, however, that part of the time he worked second shift and therefore had been alone with the victim in the mornings, when she claimed most of the rapes occurred. Johnson, of course, denied all of the victim's allegations regarding sexual contact or physical abuse. He did admit that he had once disciplined the victim with a belt because she had disprespected him, but claimed that no marks had been made as a result.
Two different doctors testified at trial, Dr. Morris Brown for the defense and Dr. Ralph Hicks as a rebuttal witness for the state. Dr. Brown, a family practitioner, had examined Johnson and determined that he had a much larger than average penis at ten and a half inches long and five and a half to six inches in circumference when erect. While he had not examined the victim, he had reviewed the medical records of Dr. Susan Davis-Brown, the doctor who had examined the victim immediately after the allegations were made in March of 2000. Those records disclosed that the victim's hymen was not intact but that there was only minor scarring at the entrance to her vagina, which could have been caused by many different things, including an infection. There were no other lesions or scarring in her vagina or her anus. Dr. Brown testified that, given the size of Johnson's penis and the size and age of the victim at the time of the alleged abuse, she would have had excessive bleeding and needed immediate medical treatment following the incidents. At a minimum, he believed the examination a year later would have shown extensive scarring in her vagina and anus. In addition, even if Johnson had only inserted the head of his penis into the victim's vagina, which would have had a maximum opening of two inches, there would still have been a large disparity which would have caused significant trauma. No signs of injury outside of minor scarring were disclosed in Dr. Davis-Brown's report.
Dr. Hicks, a pediatrician who examines children to evaluate abuse as part of the CARE team at Children's Hospital, examined the victim approximately eight months after the allegations were made, which was approximately nineteen months after the abuse allegedly ended. During the examination, he discovered that the hymen appeared to be intact and that there was no scarring at all. However, he also testified that the victim had nearly completed her pubertal development at the time of his examination, which indicated to him she had at least begun this development at the time of the abuse. He explained that, as pubertal development progresses, the vagina and hymen become more elastic. In addition, he clarified that, as a girl begins pubertal development, the hymen does not reach all the way across the vagina, but has some holes around the edges. Additionally, it thickens and becomes more elastic as puberty progresses. Accordingly, it is possible for an individual to be sexually active and still have no tear in her hymen. He further explained that, over time, wounds caused from sexual assault do heal, usually without scarring. Dr. Hicks explained that he had not discussed with Dr. Davis-Brown the content of her reports, so he could not testify as to what she had seen when she stated that the hymen was not intact. He explained that it was not uncommon for evaluations to produce different results, particularly when several months have elapsed. He further described that it was possible for tears in the hymen to reshape and heal over time.
Assuming as true Johnson's size as testified to by Dr. Brown, Dr. Hicks explained that it was possible for him to have sexually assaulted the victim without severe trauma. While he did not deny that serious injury was possible, he had no data to suggest that she would likely suffer severe injury and bleeding as a result of sexual assault from a man of Johnson's size. As a result, he testified that, although his examination of the victim revealed an intact hymen and no scarring, this did not rule out the possibility that she had been vaginally and anally raped by Johnson one and a half to two years prior.
When reviewing a manifest weight claim, the appellate court "reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Thompkins (1997), 78 Ohio St.3d 380, 387. A verdict should only be overturned in extraordinary situations when evidence weighs heavily against the conviction. Id.
Because the trial court, as the factfinder in this case, had the opportunity to see and hear the witnesses, we must extend substantial deference to its decisions whether, and to what extent, it found each witness credible. State v. Lawson (Aug. 22, 1997), Montgomery App. No. 16288, unreported, at p. 4. We will give deference to the findings and conclusions of the trial court provided the findings are supported by competent and credible evidence. Myers v. Garson (1993),66 Ohio St.3d 610, 614. Further, "even in a manifest weight of evidence issue, we will not disturb the choice made by the trier of fact between credible witnesses and their conflicting testimony unless it is so incredible that it defies belief." Fairborn v. Boles (May 15, 1998), Greene App. No. 97 CA 110, unreported, at p. 3.
We have reviewed all of the evidence in this case. While we find some conflicts and inconsistencies, we do not believe that the decision finding Johnson guilty was against the manifest weight of the evidence. The victim's testimony was mostly consistent and believable, despite some conflicts in times and minor inconsistencies with her mother's testimony. It is not uncommon for children to have a distorted view of time frames, nor for anyone to have difficulty remembering dates of incidents occurring more than a year or two prior.
Moreover, while Dr. Brown's testimony regarding the likelihood of injury to the victim due to Johnson's penis size was persuasive, we find that the trial court could have properly found Dr. Hicks' testimony more credible, particularly based on Dr. Hicks' experience. That testimony explained how the victim's lack of scarring and intact hymen were not inconsistent with having experienced sexual abuse a number of times over a year prior, even with a man of Johnson's size.
Based on the foregoing, we do not find that the trial court's decision finding Johnson guilty was against the manifest weight of the evidence. Accordingly, his sole assignment of error is overruled and the judgment is affirmed.
FAIN, J., and GRADY, J., concur.