[Cite as *Morris v. Mathers*, 2024-Ohio-2774.]

COURT OF APPEALS
GUERNSEY COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|  |  |  |
|---|---|---|
|  |  | JUDGES: |
| CARLA J. MORRIS | : | Hon. Patricia A. Delaney, P.J. |
|  | : | Hon. W. Scott Gwin, J. |
| Appellee-Cross-Appellant | : | Hon. Craig R. Baldwin, J. |
|  | : |  |
| -vs- | : |  |
|  | : | Case No. 23CA000027 |
| HENRY E. MATHERS, TRUSTEE OF | : |  |
| THE MATHERS FAMILY TRUST, ET | : |  |
| AL | : | <u>OPINION</u> |
|  |  |  |
| Appellants-Cross Appellees |  |  |

CHARACTER OF PROCEEDING:     Appeal from the Guernsey County Court of
                             Common Pleas, Case No. 21-CV-000071

JUDGMENT:                    Affirmed in part; Reversed and remanded in
                             part

DATE OF JUDGMENT ENTRY:      July 22, 2024

APPEARANCES:

For Appellee-Cross Appellant          For Appellants-Cross-appellees

MICHAEL GROH                          CARI FUSCO EVANS
1938 E. Wheeling Avenue               3521 Whipple Avenue N.W.
Cambridge, OH 43725                   Canton, OH 44718

*Gwin, J.,*

{¶1}  Both Carla Morris and Henry E., "Bo," Mathers appeal the September 6, 2023 judgment entry of the Guernsey County Court of Common Pleas.

*Facts & Procedural History*

{¶2}  Carl and Hazel Mathers have four children:  Henry E. Mathers, known as "Bo" Mathers, Carla J. Morris, Sue A. Schultz, and Vonda Tipple.  On April 1, 2008, Carl and Hazel Mathers created "The Mathers Family Trust," a revocable living trust.  Carl and Hazel were the initial trustees.  A Memorandum of Trust was recorded on April 16, 2009 at the Guernsey County Recorder's Office.

{¶3}  Article Ten of the trust is entitled "Trustee Powers" and provides the trustee "has the power and authority to manage and control, buy, sell, and transfer the trust property * * *."  Article Ten also lists twenty-five specific powers the trustee has.  These include the power to invest, retain property, manage trust property, sell or repair trust property, improve trust property, make loans to the trust, borrow money, encumber trust property, make a gift, and delegate.

{¶4}  The trust provides as follows with regards to the surviving trustor's expenses:

On the Surviving Trustor's death, and subject to any power of appointment exercised by the survivor, the Trustee may in the Trustee's discretion pay out of the principal of the Qualified Trust 'C', or if it has been exhausted, of the Survivor's Trust 'A,' the surviving Trustor's debts outstanding at the time of his or her death and not barred by the statute of limitations, Statute of Frauds, or any other provision of law, last-illness and funeral expenses,

attorneys' fees, other expenses and estate and inheritance taxes, including interest and penalties arising on the Surviving Trustor's death.

**{¶5}** The trust also contained a "distribution of gifts" provision which provided that, upon the Surviving Trustor's death, the trustee shall distribute gifts as follows:

(1) The 159.532 acres of land located in Guernsey County, shall be distributed to Henry E. Mathers,

(2) The 26.995 acres of land located in Guernsey County, shall be distributed to Henry E. Mathers,

(3) Henry E. Mathers shall have the right to buy the 201.26 acres of land located in Guernsey County for fair market value, and the proceeds shall be divided equally and distributed among Sue A. Schultz, Carla J. Morris, and Vonda R. Tipple.

**{¶6}** Hazel Mathers died on September 24, 2012. On October 1, 2012, Carl executed a "Directive to the Successor Trustee of the Mathers Family Trust." The directive provided, in part, that all personal property, including vehicles, ATV's, trailers, livestock, cattle, farm equipment, and tools, be gifted to Bo. Also, on October 1, 2012, Carl resigned as trustee. The resignation provides that Carl elected to terminate any and all authority granted to him as trustee and appoint Bo as successor trustee.

**{¶7}** An addition to the "distribution of gifts" portion of the trust was made on August 3, 2018. Per that addition, the property located at 4305 Bloomfield Road (123 acres), commonly known was Anker Lane or Uncle Bob's Farm, was to be gifted to Henry E. Mathers upon the Surviving Trustor's death.

{¶8} Carl died on July 23, 2020. On March 15, 2021, Morris filed a complaint against Bo and the trust, requesting that the court: (1) find Bo breached his fiduciary duty pursuant to R.C. 5810.01 and (2) determine the rights, duties, and obligations with regard to the trust pursuant to R.C. 5808.14. Morris filed an amended complaint in September of 2021 to add Bo's wife Terri Mathers a defendant.

{¶9} The trial court held a bench trial on Morris' complaint on August 10 and 11 of 2023.

{¶10} Bo testified he has worked on his father's farms since he was thirteen years old. When Bo was in his 20's, his father had a lot of outside help that Carl had hired to work on the farms. At that point, his father paid Bo $20 per week for his assistance on the farms. In 2001, Carl increased what he paid Bo to $150 per week. Several years later, that amount increased to $200 per week. When Bo became successor trustee in 2012, his father increased Bo's weekly payment to $300. Bo did not claim this income on his tax returns. Bo has lived on one of the trust properties from 2001 to present, per an agreement with his father. He has never paid rent.

{¶11} When Bo and his father originally started farming, they farmed together as a partnership. Bo had four of his own farms that he managed and farmed, Carl had the four farms that were part of the trust that he managed and farmed, and together they rented and farmed thirteen other farms. Bo testified that his four farms and the thirteen farms they rented were "non-trust ground" and were "totally different than trust ground." Every December, Bo would pay his father money for seeds for the next year's crop out of Bo's own funds. Bo did this in December because in December the prices are available

for crops, so he could estimate how much he would obtain for the crops. In late winter or early spring, his father would reimburse him once there was enough money in the trust.

{¶12} Bo and Carl ran operations under the partnership until 2019. In 2019, Bo fully took over operation of the trust farms. That year, when Bo harvested all the farms, they sold Carl's grain from the trust farms so that Bo could put his grain in the bins. In December of 2019, out of his own funds, Bo paid the trust and his father $43,000 for seeds for next year's crops. Accordingly, the check he wrote to himself in February of 2020 for $43,102.86 was repayment for the money he fronted for the seeds. Bo also testified a $35,692.06 from the trust to him was reimbursement to himself for seed corn he purchased for the trust farms. When Bo became successor trustee, he did not have a separate bank account for the trust. He used the checking account his father had used, which Bo believed was Carl's personal checking account. However, the name on the checking account was "The Mathers Family Trust."

{¶13} When his father ran the farms, the trust consisted of four properties. All trust debts were paid from trust assets, no matter which property they were associated with. If there was an expense associated with the 201 acres, his father paid that expense from a combination of income from all four properties. Neither Bo or his father segregated income and expenses from one property to another; rather, it was all in one large bundle.

{¶14} Bo testified that, at the time of his father's death, the trust assets consisted of four properties: Eighth Street Road/Shepherds Farm property (26 acres), 5651 Mathers Road (home farm), Lake Road farm (201 acres), and Anker Lane Road/Uncle Bob's Farm (121 acres). Pursuant to the trust, he was gifted the Eighth Street Road property, the Mathers Road property, and the Anker Lane property. The trust purchased

the Anker Lane property at the request of Carl, who did not want to see the properties split up. The Anker Lane property has a mortgage on it. Bo hired Jeffrey Leonard to appraise the 201 acres to determine its fair market value. Bo feels the valuation of $556,282 is fair and reasonable.

{¶15} Bo stated he did not receive any compensation as trustee. He received $300 per week from the trust, but that "was not for the trust." He didn't ask for trustee fees because there was not enough money in the trust. The farm was not profitable during the time he was in charge, and he continued to farm because that is what his dad wanted him to do. Bo made more money working jobs elsewhere, but he worked on the family farm because he liked working with his dad. Bo submitted Exhibit K, which is from the Guernsey County Probate Court's, to determine how much in trustee fees to charge. He based his requested fee of $150,354 from the gross income of trust farming operations from 2012 through 2020. Bo admitted he is seeking trustee fees for years in which the trust farms lost money.

{¶16} Bo testified to Exhibit 1, a detailed compilation of receipts for repairs, labor, utilities, property insurance, property taxes, mortgage, field maintenance, Carl's medical bills, and Carl's funeral fees. These were all his funds that he personally expended to repair or improve trust property (Mathers Road, Anker Lane, home farm, 201 acres). Bo originally requested $211,772.10 for reimbursement, but he revised that to a lower number of $194,300.64 because he could not find receipts and invoices to substantiate the higher number.

{¶17} Though the receipts were not all for repairs and expenses associated with the 201-acre property at issue in this case, Bo stated they were all for repairs and

expenses for trust property (Mathers Road, Anker Lane, home farm, 201 acres). Bo testified some of the bills contained in Exhibit 1 were for repairs and expenses for the properties prior to them being placed in the trust. The parties stipulated that, of the $80,787.27 requested for repairs, $22,500 of that amount is for repairs that were done prior to the establishment of the trust. Additionally, that $22,324 were specifically utilized for the 201 acres. Bo testified that, though he could have sold trust property to pay these debts, he did not do so because it would have "tore him [Carl] up." Thus, he personally loaned the trust money. Bo's goal was to keep all of the farms, as per Carl's wishes.

{¶18} Morris testified as to repairs to the 201 acres. She stated her father told all of the children that "whatever we put into it, our father said that we weren't getting back." Morris never received an accounting of the trust from Bo, and she was never provided any documentation until the initiation of litigation against Bo. Morris does not believe it is fair and reasonable for any allowed expenses to be charged against only her and her sisters' interest. Morris did not dispute that the trust provided Bo with the ability to sell trust property or repair trust property. Morris believes there was money made from the corn and beans sales each year to fund the trust. Her father told her the trust had money in it. Morris could not testify to specific financial information concerning the trust because, when her father was alive, his financial situation was not her business. She never discussed finances with her father when he was alive.

{¶19} Morris does not think Bo is entitled to the expenses he seeks because they were for property other than the 201 acres. She believes Bo should have asked his father to reimburse him for these expenses before he passed away. Morris testified the actions

of Bo as trustee were not reasonable, specifically the valuation of the 201 acres, the charging of expenses, and the amount of trustee fees.

{¶20} Rhonda Marvin ("Marvin") appraised the 201 acres in March of 2022. She viewed the property, walked through the home, checked the barns, pulled comparables, and determined value. She determined the value of the property to be $950,000. Marvin included mineral rights in her appraisal. Marvin stated it was possible the value could have been different in January of 2021 when Bo exercised his right to purchase the property; however, some of the comparables she used were from 2021. Marvin confirmed that the mineral rights added significant value to the property.

{¶21} Ernest Gardner ("Gardner") appraised the 201 acres in October of 2020. He valued the property at $603,000. He did not value the mineral rights, as he felt he was not qualified to do that; however, he felt mineral rights would increase the value of the property.

{¶22} Jeffrey Leonard ("Leonard") appraised the 201 acres in November of 2020 for $556,282. He believes there would be a large discrepancy in home values from January of 2021 to when Marvin completed her appraisal in March of 2022. In his appraisal, he proceeded as if the mineral rights were not owned by the property owner. When asked how he would value the mineral rights, Leonard testified it would be difficult to do since the time frame was years ago, but "guesstimated" the mineral rights would increase the value of the property by $1,500 to $1,800 per acre. Leonard stated mineral rights would increase the value of the property. At the date of trial, the mineral rights were approximately $3,500 per acre.

{¶23} The parties stipulated that all the appraisers (Marvin, Leonard, and Gardner) are experts.

{¶24} The trial court issued a judgment entry on August 22, 2023. As to Bo's reimbursement request, the trial court found there was no agreement in writing for the trust to repay Bo for the money he expended for improvements to the trust farms; and, because Bo was gifted three of the farms, there would be "unjust enrichment" for Bo to receive repayment for improvements and repairs to the farms. The trial court denied Bo's request for trustee fees, finding "the services that were rendered in this matter as Trustee do not correspond to the same service level that a qualified Court appointed Trustee would be entitled to receive fees from." As to mineral rights, the court concluded that the 201-acre farm is receiving royalty income and that all the appraisers testified mineral rights would increase the value of the property. However, since there was not sufficient testimony as to the valuation of the mineral rights at the time of Bo's exercising his right to purchase the property, the mineral interest for the 201-acre tract should be divided equally amongst the children of Carl and Hazel Mathers. The trial court found Morris failed to prove by clear and convincing evidence that Bo breached his fiduciary duty.

{¶25} Accordingly, the trial court concluded: repairs and expenses relating to the trust properties are not deductive from the proceeds payable to the sisters; Bo is not entitled to any trustee fees; the fair market value of the 201-acre property is $603,000; the total cost of the medical and funeral expenses ($18,780.43) should be divided equally amongst the four children; the mineral interest for the 201-acre tract should be divided equally amongst the four children; and the royalty income held in counsel's trust account should be divided equally amongst the four children. The trial court ordered Bo to pay

each one of his three sisters $196,304.89.  The trial court issued a nunc pro tunc entry on September 6, 2023 to correct a mathematical error.

{¶26}  Bo appeals the September 6, 2023 judgment entry of the Guernsey County Court of Common Pleas and assigns the following as error:

{¶27}  "I. THE TRIAL COURT APPLIED THE INCORRECT LEGAL STANDARD AND FAILED TO ISSUE A DECLARATION REGARDING THE POWERS AND RIGHTS GRANTED BY THE TRUST TO BO MATHERS AS TRUSTEE.

{¶28}  "II. THE TRIAL COURT APPLIED THE INCORRECT STANDARD OF REVIEW REGARDING THE ACTIONS OF BO MATHERS AS TRUSTEE AND THE JUDGMENT OF THE TRIAL COURT MUST BE REVERSED AND JUDGMENT ENTERED ALLOCATING THE TRUST FUNDS PURSUANT TO THE UNDISPUTED EVIDENCE.

{¶29}  "III. THE TRIAL COURT ERRED IN FAILING TO PERMIT BO MATHERS AS TRUSTEE TO SET A REASONABLE FEE FOR SERVICES AS THE SUCCESSOR TRUSTEE."

I. & II.

{¶30}  In Bo's first and second assignments of error, he essentially makes three arguments: (1) the trial court committed error in rejecting Bo's right to seek repayment of trust expenses that he loaned to the trust; (2) the trial court was without the authority to discard the appraisal by Bo's appraiser and select a competing appraisal and; (3) the trial court committed error in its treatment of the mineral rights on the 201-acre property.

{¶31} The trial court made the determination on these issues pursuant to Morris' request for the court to issue a declaratory judgment and to determine the rights, duties, and obligations with regard to the trust pursuant to R.C. 5808.14.

{¶32} The construction of a trust is a matter of law that appellate courts review de novo. *Arnott v. Arnott*, 2012-Ohio-3208. Thus, an appellate court independently reviews the language of the trust to ascertain whether the trial court reached the correct conclusion. *Id.* The specific terms of the trust, as well as any applicable statutes, generally control a trustee's authority. *Id.* A court's purpose in interpreting a trust is to effectuate, within the legal parameters established by a court or by statute, the settlor's intent. *Id.* The settlor's intent is presumed to reside in the language the settlor chose to use in the trust. *Kelly v. Medical Life Ins. Co.*, 31 Ohio St.3d 130, 509 N.E.2d 411 (1987). When reviewing the language a settlor chose to use in a trust, courts must apply unambiguous language as written. *Id.*

*Reimbursement for Repairs and Improvements*

{¶33} The trial court declared and determined that Bo did not have a right to deduct the amount he advanced or loaned the trust for repairs and improvements to trust property from the sale amount of the 201-acres.

{¶34} The trial court found that, because Bo was gifted three of the four trust properties, there would be "unjust enrichment" for him to receive repayment for improvements and repairs to the trust properties he utilized his own money to pay. However, the question is not one of unjust enrichment. Rather, the question is whether Bo was authorized to take these actions pursuant to the plain language in the trust and whether his actions were in compliance with the trust language.

**{¶35}** The specific terms of a trust control a trustee's authority. Article Ten, Section (7) of the trust provides the trustee has the "power to manage, control, improve and repair all real trust property." Article Ten, Section (9) provides the trustee with the power to "improve and repair trust property." Article Ten, Section (13) provides the trustee with the power to "loan or advance the trustee's own funds to the trust for any trust purpose."

**{¶36}** Bo testified the repairs and improvements were necessary on the trust properties. He stated that, without his loans to the trust to complete these repairs and improvements, there would have been no money in the trust, and he could not continue farming like his father wanted. Bo testified to Exhibit 1, a detailed compilation of receipts for repairs, labor, utilities, property insurance, property taxes, mortgage payments, and field maintenance that he loaned money to the trust to pay. Further, Bo stated that all the repairs and improvements were done on trust property (Mathers Road, Anker Lane, home farm, 201-acre farm). Morris did not offer any evidence that Bo's personal funds were not loaned to the trust or that any of the funds were used for non-trust property. Based upon the unambiguous language of the trust, we find Bo was authorized to take these actions.

**{¶37}** Simply because some of the repairs were for trust properties other than the 201-acre property does not void the specific power conferred to Bo by the trust to make loans, repairs, and improvements. The plain language of the trust permitted Bo to take these actions with any of the properties contained in the trust. Further, Bo testified that all trust debts were paid from trust assets, no matter which property they were associated with. If there was an expense associated with the 201-acre property, he or his father paid that expense from a combination of income from all four properties.

{¶38} Morris generally argues that, despite the broad language in a trust, a trustee's actions must be reasonable. However, in this case, Bo provided a binder of receipts to detail where the money went that he loaned to the trust for repairs and expenses. Morris provided no testimony or evidence that any of the repairs or improvements done to any of the trust properties was not necessary or was not a reasonable use of funds. Rather, she simply argues it was not fair to take the amount out of her gift. However, the issue is not one of "fairness," but the issue is what rights, duties, and obligations were required of Bo pursuant to his status as trustee. Accordingly, upon our de novo review, we find Bo was authorized to loan the trust money for repairs and improvements, and this debt is considered a debt of the trust that may be paid by the trustee upon Carl's death.

{¶39} The trial court additionally determined Bo was not entitled to repayment because there was no agreement in writing for the trust to repay Bo for the money he expended for repairs or improvements to the trust farms. However, as noted above, the terms of the trust gave Bo broad authority over the management of the trust, including the power to repair the real property, the power to improve and repair trust property, to loan or advance his own funds to the trust for any trust purpose, and to borrow money. We find nothing in the trust language or statutory requirements that require Bo to obtain written consent or to have an agreement in writing before exercising these powers. *Saba v. Fifth Third Bank of NW Ohio*, 2002-Ohio-4658 (6th Dist.). Accordingly, no separate written agreement for the trust to repay Bo for the money he expended for repairs or improvements to the trust farms was required.

{¶40} Bo testified that some of the bills contained in Exhibit 1 were for repairs and expenses he paid for prior to the properties being placed in the trust. The parties stipulated that $22,500 of the $194,300.64 he requested was loaned or spent prior to the establishment of the trust. We find the repairs and improvements done prior to the establishment of the trust to be outside the plain language of the trust. Accordingly, they cannot be considered when determining the rights, duties, and obligations with regard to the trust pursuant to R.C. 5808.14.

{¶41} Of the $194,300.65 requested by Bo, the trial court has already determined the $18,780.43 in funeral and medical expenses should be divided equally among the four children. Further, $22,500 of the requested reimbursement is pre-trust, and cannot be considered. Accordingly, Bo has the right to deduct $153,020.22 he advanced from the sale amount of the 201-acres. Upon our de novo review, we find, pursuant to the plain and unambiguous language contained in the trust, Bo had the right and power to loan funds to the trust and the amount loaned was a debt of the trust that Bo was permitted to settle prior the distribution of any gifts.

*Real Estate Price*

{¶42} In his first and second assignments of error, Bo contends the trial court committed error in selecting an appraisal other than the appraisal of Bo to determine the fair market value of the 201-acre property.

{¶43} Bo cites Article Ten, Section (12) of the trust in support of his argument that he had complete discretion to determine the fair market value of the property. Article Ten, Section (12) is entitled "power to purchase property from estate" and provides the trustee with the authority, "to purchase property at its fair market value, as determined by the

Trustee in the Trustee's discretion, from the probate estate of either Trustor." Utilizing the plain language contained in the trust, this section only applies when a trustee is purchasing property from Carl's estate. However, Carl does not have a probate estate. Rather, all of the assets are being distributed from the trust in accordance with Article Eight of the trust. Article Eight of the trust does not contain the broad language that the trustee has the discretion to determine the fair market value of the property.

{¶44} Rather, Article Eight provides that Bo has the right to buy the 201-acre property "for fair market value." Article Eight contains no language stating Bo has discretion in determining the fair market value of the property, and is silent on who is to determine the fair market value of the property. Further, the provisions of the Ohio Trust Code provide that a trustee must administer the trust in good faith (R.C. 5808.01), administer the trust as a prudent person considering the terms, distributional requirements and circumstances of the trust (R.C. 5808.04), and utilize reasonable care, skill, and caution (R.C. 5808.04). Each of these provisions sets forth a standard of reasonableness, which depends upon the facts and circumstances of each case. *Bryan v. Chytil*, 2021-Ohio-4082 (4th Dist.); *In re Marjorie Fearn Trust*, 2012-Ohio-1029 (5th Dist.). We find no error in the trial court's determination that the reasonable and fair market value of the property in this case was $603,000 based upon Gardner's appraisal. Gardner appraised the property in October of 2020 and testified to his opinion as to fair market value. The trial court had the authority to determine Gardner's appraisal represented the reasonable fair market value of the 201-acre property.

*Mineral Rights*

{¶45} In his first and second assignments of error, Bo argues the trial court committed error in its treatment of the mineral rights on the 201-acre property. Bo essentially contends that, pursuant to the trust language, he is entitled to value the property at his discretion and, in his discretion, the value does not include any amount for mineral rights.

{¶46} Bo's argument again centers around the "discretion" portion of Article Ten, Section (12). As discussed above, the plain language of that section provides that discretion applies if Bo were purchasing the property from Carl's estate. However, Carl has no probate estate, and his assets are being distributed pursuant to Article Eight of the trust. Article Eight does not state the trustee has "discretion" in the determination of fair market value and is silent on who is to determine fair market value. Accordingly, we find the trial court had the authority to determine whether the fair market value of the property should include the value of the mineral rights. In this case, the mineral rights are not severed from the property. All three of the appraisers testified that mineral rights added value to the property. Marvin testified the mineral rights added value to the property. She did value the mineral rights, but testified she did not appraise these rights until March of 2022. Gardner stated his appraisal did not include mineral rights, but testified mineral rights would "increase the value of the property." Leonard, Bo's expert, completed his appraisal without valuing the mineral rights. However, he testified that mineral rights "have a lot of sway on the value of the actual property" and that mineral rights are "kind of a big deal anymore."

**{¶47}** During the trial, the parties and the court had concerns about Marvin's appraisal of the mineral rights because they were valued more than six months from the date of purchase. She completed her appraisal in March of 2022, but the date of purchase was in January of 2021. Marvin acknowledged six months is standard in the industry for how long an appraisal is good, and stated there could be a fluctuation of the value of mineral rights from January 2021 to March of 2022. Leonard testified it would be difficult to value the mineral rights at one snapshot in time, but his best "guess" was that they may have increased the value of the property by $1,500 to $1,800 per acre. However, on the date of trial, they would have been worth $3,500 per acre. Gardner also testified he would not be able to value the mineral rights as of January 2021.

**{¶48}** Due to the concerns and lack of ability of the experts to determine a value for the mineral rights, the trial court ordered the mineral interest for the 201-acre tract to be divided equally amongst the four children. We find the trial court had the authority to treat the mineral interest in this manner pursuant to R.C. 5808.14 and the authority to determine it was not reasonable for Bo to exclude the mineral rights from his determination of the fair market value of the 201-acre property. Accordingly, we find the trial court did not commit error in its treatment of the mineral rights.

**{¶49}** Bo's first and second assignments of error are overruled in part and reversed and remanded in part.

III.

**{¶50}** In Bo's third assignment of error, he argues the trial court committed error in denying Bo reasonable trustee fees.

{¶51} In this case, the trust did not specify the trustee's compensation. R.C. 5807.08(A) provides, "if the terms of a trust do not specify the trustee's compensation, a trustee is entitled to compensation that is reasonable under the circumstances."

{¶52} The trial court found the activities Bo described in his testimony regarding trustee fees were not activities that corresponded to the same service level a qualified trustee would be entitled to receive fees from.

{¶53} While we agree with the trial court that a portion of the requested trustee fees were not compensable due to Carl and Bo's agreement that Bo be paid a certain amount weekly and be able live in the house rent-free in exchange for his weekly work on the trust farms, Bo testified to activities separate from time he spent working on the farm that would be compensable, as they were not part of Carl and Bo's agreement. Specifically, Bo testified to the increased financial and accounting responsibilities associated with the farm and handling his father's personal finances when he became trustee. As detailed below, there is no finding that Bo breached his fiduciary duty upon which to base the denial of trustee fees. Thus, pursuant to R.C. 5807.08(A), Bo is entitled to reasonable compensation for the financial and accounting responsibilities he completed during his time as trustee.

{¶54} Accordingly, we sustain Bo's third assignment of error in part, and remand the matter to the trial court to determine reasonable compensation for the financial and accounting responsibilities Bo completed for the trust farms and Carl personally.

{¶55} Morris filed a cross-appeal and asserts the following assignments of error:

{¶56} "I. THE TRIAL COURT ERRED IN FINDING THAT APPELLANT DID NOT BREACH HIS FIDUCIARY DUTY.

{¶57} "II. NO EXPENSES SHOULD HAVE BEEN ALLOCATED TO APPELLEE'S JUDGMENT."

Cross-Assignment of Error I.

{¶58} In Morris' first assignment of error, she contends the trial court committed error in finding Bo did not breach his fiduciary duty. To prevail on a breach of fiduciary duty claim, "a party must show the existence of a fiduciary relationship, failure to comply with a duty accorded that relationship, and damages proximately caused by that failure." *State ex rel. Atty. Gen. v. Vela*, 2013-Ohio-1049 (5th Dist.). A party must prove a breach of fiduciary duty by clear and convincing evidence. *Id.*

{¶59} Appellate courts review a trial court's finding regarding a breach of trust under the Ohio Trust Code using the manifest weight of the evidence standard. *Commerce & Industry Ins. Co. v. City of Toledo*, 45 Ohio St.3d 96, 543 N.E.2d 1188 (1989). In a manifest-weight-of-the-evidence review, we "determine whether in resolving conflicts in the evidence the [fact-finder] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed. *Eastley v. Volkman*, 2012-Ohio-2179.

{¶60} A judgment supported by competent and credible evidence will not be reversed as being against the manifest weight of the evidence. *C.E. Morris Co. v. Foley Const. Co.*, 54 Ohio St.2d 279, 376 N.E.2d 578 (1978). A reviewing court must not substitute its judgment for that of the trial court where there exists some competent and credible evidence supporting the judgment rendered by the trial court. *Myers v. Garson*, 66 Ohio St.3d 610, 614 N.E.2d 742 (1993). The underlying rationale for giving deference to the findings of the trial court rests with the knowledge the trial judge is best able to view

the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of the proferred testimony. *Seasons Coal Co. v. City of Cleveland*, 10 Ohio St.3d 77, 461 N.E.2d 1273 (1984).

{¶61} In her brief and at trial, Morris asserted Bo breached his fiduciary duty by: transferring $43,000 and $35,692.06 to himself from the trust, failing to provide Morris with an accounting for the trust prior to Carl's death, staying at trust property rent-free, and accepting payment from the trust when the farm was not profitable.

{¶62} As to the $43,000 and $35,692.06 transfers from the trust to Bo, Bo provided undisputed testimony that each year in December, he would pay the trust money for seeds for the next year's crop out of his own funds. In late winter or early spring, his father would reimburse him once there was enough money in the trust. Bo testified this money was repayment for money expended to buy seeds for farming on the real property contained in the trust. Morris provided no evidence or testimony to dispute Bo's testimony. Accordingly, the trial court's finding that this was not a breach of fiduciary duty is supported by competent and credible evidence.

{¶63} With regard to failing to provide Morris with an accounting prior to Carl's death, Article Fourteen of the trust specifically provides that, "during either Trustor's lifetime, the Trustee shall account only to the Trustees or the survivor." Further, that "after the death of both Trustors, the Trustee shall render an accounting, from time to time but not less frequently than every two (2) yeas after any prior accounting." Pursuant to the plain language of the trust, Bo was not required to provide Morris with an accounting during Carl's lifetime. Carl died on July 23, 2020. Thus, Bo was required to provide Morris with an accounting by July 23, 2022. Morris did not dispute that Bo's counsel

provided her with financial records and trust accounting during the pendency of the case. Accordingly, the trial court's determination is not against the manifest weight of the evidence.

{¶64} Finally, as to the payment of $300 per week to Bo and his ability to live rent-free in the home on trust property since 2001, we find the trial court's determination that these actions did not constitute breaches of fiduciary duty to be supported by competent and credible evidence. Bo provided undisputed testimony that he and his father had an understanding that Bo would assist his father on the trust farms and Bo would receive $300 per week and could stay in the home rent-free. Further, during her testimony, Morris testified she believed Bo was entitled to the $300 per week. Morris' first cross-assignment of error is overruled.

## Cross-Assignment of Error II.

{¶65} In Morris' second assignment of error, she argues the trial court committed error in allocating the funeral and medical expenses to the judgment against Bo. We disagree. As detailed above, the trust gave Bo broad powers to utilize trust fund to pay expenses. Further, the trust specifically provides that, upon Carl's death, any debts may be paid by Bo, including last-illness and funeral expenses. Bo provided undisputed testimony that he expended the funds for Carl's medical bills, the ambulance, the funeral bill, and for the preacher. None of these expenses is unreasonable. Morris' second cross-assignment of error is overruled.

{¶66} Based on the foregoing, Morris' cross-assignments of error are both overruled. Bo's assignments of error are affirmed in part, and reversed and remanded in part for proceedings in accordance with this opinion, and for the trial court to determine

reasonable trustee compensation for the financial and accounting responsibilities Bo completed and deduct the reasonable trustee compensation plus the amount for repairs and expenses from the total sale price ($603,000) to determine the amount owed to each sister.

By Gwin, J.,

Delaney, P.J., and

Baldwin, J., concur