WOOTEN, Appellee,

v.

KREISCHER, Appellant, et al.

[Cite as *Wooten v. Kreischer*, 162 Ohio App.3d 534, 2005-Ohio-4078.]

Court of Appeals of Ohio,
Fifth District, Perry County.

No. 04–CA–13.

Decided Aug. 3, 2005.

**536**

[redacted]

Paul R. Panico, for appellee.

Richard M. Lewis and Jill H. Shriver, for appellant.

EDWARDS, Judge.

{¶ 1} Defendant-appellant, Robert Kreischer, appeals from the June 18, 2004 entry of the Perry County Court of Common Pleas.

## STATEMENT OF THE FACTS AND CASE

{¶ 2} Kreischer assaulted appellee, Terry Wooten, on May 28, 2000. Subsequently, on January 22, 2001, Kreischer was convicted of felonious assault and ordered to pay restitution in the amount of $9,163.16 to appellee. Pursuant to an opinion filed on January 23, 2002, in *State v. Kreischer*, Perry App. No. 01–CA–04, 2002-Ohio-357, 2002 WL 106683, this court affirmed appellant's conviction, but held that the evidence did not support a restitution award of $9,163.16. The matter was then remanded to the trial court for a new hearing on restitution.[1]

{¶ 3} On August 27, 2003, appellee filed a complaint against appellant and James Ponsart in the Perry County Court of Common Pleas. Appellee, in his complaint, alleged that after appellant was charged, but before he was convicted of felonious assault, he transferred his interest in specific real property to James Ponsart, a friend, and that the transfer was a fraudulent conveyance. Appellee sought relief pursuant to R.C. 1336.07.

---

1. Upon remand, the trial court ordered appellant to pay a total of $37,369.99 in restitution ($17,046.07 to appellee Wooten and $20,323.92 to Blue Cross/Blue Shield). Pursuant to an opinion filed on December 16, 2004, in *State v. Kreischer*, Perry App. No. 03CA20, 2004-Ohio-6854, 2004 WL 2958339, this court remanded the matter to the trial court with directions to enter an award of restitution of $20,323.92 to Blue Cross/Blue Shield and $2,481.31 to appellee for out-of-pocket medical expenses. The Ohio Supreme Court allowed an appeal of both 2002-Ohio-357, 2002 WL 106683, and 2004-Ohio-6854, 2004 WL 2958339. See *State v. Kreischer*, 105 Ohio St.3d 1498, 2005-Ohio-1666, 825 N.E.2d 622.

{¶ 4} Thereafter, the following evidence was adduced at the bench trial on April 21, 2004.

{¶ 5} At trial, James Ponsart testified that, in 1995, he and appellant purchased approximately 18.4 acres of vacant land in Perry County, Ohio, from Howell Investments for the purchase price of $10,000. At the time of the purchase, the April 7, 1995 deed for the property was put in appellant's name only, although Ponsart considered himself half owner of the property. On or about April 6, 1995, Ponsart had given Mary Kreischer, appellant's wife, a $5,000 cashier's check made payable to her for his half of the property. Ponsart obtained the money after taking out a loan with Metropolitan Savings Bank of Cleveland.

{¶ 6} Both Ponsart and appellant then started building cabins on the property. The two had an understanding that if either one decided to sell his interest in the property, he would offer it to the other.

{¶ 7} On May 28, 2000, appellant assaulted appellee and, as a result, was charged with felonious assault in the Perry County Court of Common Pleas. Pursuant to a quitclaim deed dated September 18, 2000, appellant conveyed his interest in the property to Ponsart for $10,000 in cash, which he considered a fair price. Appellant testified, via a trial deposition, that he decided to sell his interest in the property at his wife's suggestion because he needed money for legal fees. While appellant hated to get rid of the property, he testified that neither his wife nor his kids wanted to go to the property anymore because of the assault, so it made sense to sell it. When asked how he arrived at the $10,000 sale price, appellant indicated that he "wanted to get out of it what I put into it, $5,000 for the property and $5,000 for the materials in the cabin." Appellant did not include labor in the purchase price, since Ponsart, an experienced carpenter, had helped him build the cabin and he did not believe that it would be fair to charge Ponsart for his own labor. Appellant testified that he had not become insolvent or bankrupt as a result of selling the real estate.

{¶ 8} At the bench trial, Ponsart testified that he believed that he had received a bargain, since he paid appellant only $10,000 for the property and believed the property was worth $34,000. Ponsart further testified that he placed an ad in the local paper and tried to sell 6.42 acres, which is approximately a third of the original 18.4 acres, and his original cabin to Gary McNulty for $20,000. According to Ponsart, the cabin was nearly completed and only needed carpeting.

{¶ 9} Appellant further testified in his trial deposition that after he signed the deed over to Ponsart on September 18, 2000, he returned to the property in June 2003 with a reporter and a photographer from the *Cleveland Plain Dealer* to take

pictures[2] and that he went one other time to get his belongings. Appellant also testified that he was on the property a third time in September 2003. Appellant denied attempting to control the land after signing the deed over to Ponsart. On cross-examination, appellant testified that as of the date of his conviction for assault on January 22, 2001, he owned only a pickup truck worth approximately $3,000 and a trailer worth $500. Appellant answered in the affirmative when asked whether the truck and trailer were the only two assets in his possession as of January 22, 2001. Appellant further testified that at the time he signed the deed to Ponsart, he was employed and earning $1,000 a week and was current on all of his debts.

{¶ 10} Appellant further testified that he had a marital residence that was acquired in 1996. However, appellant's name was not on the title, because when appellant and his wife refinanced the house early in 2000 to get a lower interest rate, the house was put in only his wife's name. Although appellant, on January 22, 2001, the date of his conviction, was employed by G.Q. Contracting Company and participated in its 401(K) plan, he testified that he had not vested as of January 22, 2001, and did not know the balance in his account. Appellant testified that he believed the plan had been started in 2000.

{¶ 11} On cross-examination, appellant further testified that he believed he received a fair value when he transferred the property to Ponsart in September 2000 and that his wife signed a deed in March 2001 transferring an interest to Ponsart because when "Jim [Ponsart] went down there to try to transfer the property * * * they wouldn't let him without her signature."

{¶ 12} Mary Kreischer, appellant's wife, testified that appellant had received $10,000 for selling the property and that Ponsart paid for it in $100 and $50 bills in a white envelope. She testified that she put the money in a lockbox secured to the floor of her house and used the money for lawyer fees, bonds, and general household needs. The following testimony was adduced when Mary Kreischer was asked whether she had any other assets as of September 2000, after appellant transferred the property to Ponsart:

{¶ 13} "Q. * * * Did you have any other assets as of September of 2000, after the transfer of the property?

{¶ 14} "A. Did I?

{¶ 15} "Q. Yeah.

{¶ 16} "A. Yes, I did. My home.

{¶ 17} "Q. Okay. Did your husband have any other assets?

---

2. According to appellant, the *Plain Dealer* was "doing a story on how I was railroaded here with this felonious assault."

{¶ 18} "A. He had a pickup truck and a trailer.

{¶ 19} "Q. Okay, Do you recall the testimony at your husband's restitution hearing, where he said this guy does not deserve restitution, referring to Mr. Wooten? He then went on to say, I've spent our entire life savings and had to sale [sic] everything I own and still tens of thousands of dollars in debt because of his lies. Do you remember that?

{¶ 20} "A. Uh-huh. * * *

{¶ 21} "Q. As of September of 2000 did your husband have any funds?

{¶ 22} "A. As of September of 2000?

{¶ 23} "Q. Uh-huh.

{¶ 24} "A. Yes.

{¶ 25} "Q. But didn't you just tell me you didn't know what he had? Where he keep [sic] his money?

{¶ 26} "A. We had a joint checking account and we had the fire box.

{¶ 27} "Q. The fire box where the 10,000 was?

{¶ 28} "A. Uh-huh.

{¶ 29} "Q. Do you have any receipt for this 10,000?

{¶ 30} "A. Do I have a receipt?

{¶ 31} "Q. Yeah.

{¶ 32} "A. No.

{¶ 33} "Q. Okay. There was never any 10,000, was there?

{¶ 34} "A. There was $10,000. It's not every day you get handed $10,000, Mr. Panico."

{¶ 35} On cross-examination, Mary Kreischer testified that she and appellant owned a house in September 2000 and that they had equity in the house. She further testified that she owed a small amount of credit-card debt in September 2000 and had no other fixed debts other than the house mortgage.

{¶ 36} Marsha Wilson, a friend of appellee's, also testified at the bench trial. Wilson testified that she had met appellant, who appellee had pointed out to her on previous trips to Perry County, in June or July 2001 when he came up to her, told her that he was the property owner, and told her that she was trespassing on his land. Wilson testified that she knew that this occurred in June or July 2001 because her friend who had helped her put the quail down there with her had died the previous year, so that was the first year that she had gone by herself. Wilson showed appellant a permission slip signed by appellee, giving her permission to be on Wooten's property.

{¶ 37} Testimony also was adduced that, prior to September 18, 2000, appellee asked appellant to reimburse him for medical expenses and lost wages related to the assault.

{¶ 38} At the conclusion of the trial, the trial court, as memorialized in an entry filed on June 18, 2004, held as follows: "[T]his Court finds that the intent of the transfer [to Ponsart] was to hinder, delay or defraud Wooten [appellee] out of his claim, determines said transfer to be fraudulent and hereby orders the same to be set aside."

{¶ 39} Appellant now raises the following assignments of error on appeal:

{¶ 40} "The court erred in finding the transfer of Kreischer's interest in the real estate to Ponsart to be fraudulent so as to require that the transfer be set aside.

{¶ 41} "The trial court erred in its findings of fact relating to the 'badges of fraud' set forth in R.C. 1336.04(B).

{¶ 42} "The court erred in concluding Wooten was a creditor within the meaning of the Fraudulent Transfer Act."

## I, II

{¶ 43} Appellant, in his first two assignments of error, argues that the trial court erred in holding that appellant's transfer of the property to Ponsart was fraudulent and in ordering it to be set aside. We agree.

{¶ 44} Appellant's assignments of error challenge the trial court's decision as being against the manifest weight of the evidence. A judgment supported by some competent, credible evidence will not be reversed by a reviewing court as against the manifest weight of the evidence. *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578. An appellate court must not substitute its judgment for that of the trial court when there exists some competent and credible evidence supporting the judgment rendered by the trial court. *Myers v. Garson* (1993), 66 Ohio St.3d 610, 614 N.E.2d 742.

{¶ 45} The Ohio Uniform Fraudulent Transfer Act, R.C. Chapter 1336, creates a right of action for a creditor to set aside an allegedly fraudulent transfer of assets. R.C. 1336.04 states, "(A) A transfer made or an obligation incurred by a debtor is fraudulent as to a creditor, whether the claim of the creditor arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation in either of the following ways:

{¶ 46} "(1) With actual intent to hinder, delay, or defraud any creditor of the debtor;

{¶ 47} "(2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and if either of the following applies:

{¶ 48} "(a) The debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction;

{¶ 49} "(b) The debtor intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due."

{¶ 50} The issue concerning fraudulent intent is to be determined based upon the facts and circumstances of each case, and "[t]he burden of proof in an action to set aside a fraudulent conveyance must be affirmatively satisfied by the complainant." *Stein v. Brown* (1985), 18 Ohio St.3d 305, 308, 18 OBR 352, 480 N.E.2d 1121. However, in order "[t]o succeed on a fraudulent-transfer claim, the creditor need not prove the elements of common-law fraud." *Lesick v. Medgroup Mgt., Inc.* (Oct. 29, 1999), Hamilton App. No. C–990097, 1999 WL 979136, at *4. Because of the difficulty in obtaining direct proof of fraudulent intent, "courts have recognized certain 'badges' or indicia of fraud, circumstances which usually or frequently attend a conveyance designed to hinder, delay, or defraud a creditor, which in concert with other suspicious circumstances, are considered sufficient to prove fraudulent intent." *Barbee Concrete Constr. v. Bachinski Builders, Inc.* (Nov. 20, 1997), Franklin App. No. 97APE03–397, 1997 WL 723195, at *3.

{¶ 51} R.C. 1336.04(B) sets forth several of the well-established badges of fraud, and states as follows:

{¶ 52} "In determining actual intent under division (A)(1) of this section, consideration may be given to all relevant factors, including, but not limited to, the following:

{¶ 53} "(1) Whether the transfer or obligation was to an insider;

{¶ 54} "(2) Whether the debtor retained possession or control of the property transferred after the transfer;

{¶ 55} "(3) Whether the transfer or obligation was disclosed or concealed;

{¶ 56} "(4) Whether before the transfer was made or the obligation was incurred, the debtor had been sued or threatened with suit;

{¶ 57} "(5) Whether the transfer was of substantially all of the assets of the debtor;

{¶ 58} "(6) Whether the debtor absconded;

{¶ 59} "(7) Whether the debtor removed or concealed assets;

{¶ 60} "(8) Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

{¶ 61} "(9) Whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

{¶ 62} "(10) Whether the transfer occurred shortly before or shortly after a substantial debt was incurred;

{¶ 63} "(11) Whether the debtor transferred the essential assets of the business to a lienholder who transferred the assets to an insider of the debtor."

{¶ 64} If a creditor established a sufficient number of badges of fraud with regard to a transfer, the burden of proof shifts to the defendant to show that the transfer was not fraudulent. See *Cardiovascular & Thoracic Surgery of Canton, Inc. v. DiMazzio* (1987), 37 Ohio App.3d 162, 166, 524 N.E.2d 915.

{¶ 65} Appellant argues that the trial court erred in finding that the transfer was fraudulent, since there is no evidence that appellant was insolvent at the time of the transfer or that he became insolvent due to the transfer. We agree. R.C. 1336.02 states, "(A)(1) A debtor is insolvent if the sum of the debts of the debtor is greater than all of the assets of the debtor at a fair valuation.

{¶ 66} "(2) A debtor who generally is not paying his debts as they become due is presumed to be insolvent."

{¶ 67} A plaintiff bears the burden of proof with respect to the issue of insolvency under Ohio's Uniform Fraudulent Conveyance Act. *In re Gabor* (Bkrtcy.N.D.Ohio 2002) 280 B.R. 149.

{¶ 68} Upon our review of the evidence, we find that there was no evidence that appellant was insolvent at the time of the transfer of the property to Ponsart or that he became insolvent due to the transfer. Testimony was adduced at the bench trial that appellant owned a truck and trailer with a combined value of $3,500, as well as furniture, tools, and other household items. Testimony also was adduced that, other than their home mortgage, appellant and his wife had little credit-card or other debt. Appellant's wife testified that the couple had equity in their house, which they had recently refinanced. The amount of equity is unknown from the record. Appellant's wife testified that the couple had made their house payments in 2001, as well as their car payment.[3] Both appellant and his wife testified that they had not become insolvent as a result of selling the property to Ponsart. Testimony was also adduced that appellant earned $45,244

---

3. The car was paid off in 2003.

in 2001 and $54,114 in 2002. Based on the foregoing, we find that appellee did not meet his burden of showing that appellant was insolvent. In short, there was no evidence that at or around the time of the transfer, the sum of appellant's debts was greater than all of his assets or that appellant was not paying his bills as they became due.[4]

{¶ 69} Based on the foregoing, we hold that the trial court erred in finding that the transfer of the property to Ponsart was substantially a transfer of all of appellant's assets.

{¶ 70} We further find that there was not competent and credible evidence that the transfer was made to an insider. R.C. 1336.01 states as follows:

{¶ 71} "(G) 'Insider' includes all of the following:

{¶ 72} "(1) If the debtor is an individual, any of the following:

{¶ 73} "(a) A relative of the debtor or of a general partner of the debtor;

{¶ 74} "(b) A partnership in which the debtor is a general partner;

{¶ 75} "(c) A general partner in a partnership described in division (G)(1)(b) of this section;

{¶ 76} "(d) A corporation of which the debtor is a director, officer, or person in control."

{¶ 77} The trial court specifically cited R.C. 1336.01(G)(1)(a) in finding that the transfer to Ponsart was to an insider. However, there is no evidence in the record that Ponsart was appellant's relative. Furthermore, at the bench trial, Ponsart testified that it was never his intention to form a partnership[5] for profit with appellant with respect to the land, and appellant testified that the two never bought the land intending to make a profit. As noted by appellant, there was no evidence to the contrary. While the trial court stated that at the criminal restitution hearing on September 3, 2002, appellant identified Ponsart as his "partner," upon our review of the transcript of the hearing, we find no such statement.

---

4. As noted by appellant, while appellant may have been insolvent in September 2003, when the restitution hearing was held, the issue is whether appellant was insolvent at the time of the transfer of the property to Ponsart in September 2000 or became insolvent due to that transfer.

5. R.C. 1775.05(A) defines a partnership as "an association of two or more persons to carry on as co-owners a business for profit." R.C. 1775.06(B) states that joint property, common property, or part ownership of property "does not of itself establish a partnership, whether such co-owners do or do not share any profits made by the use of property."

{¶ 78} Based on the foregoing, we find that the trial court erred in setting aside the conveyance as fraudulent, since there were not sufficient badges of fraud establishing that the transfer was fraudulent.

{¶ 79} Appellant's first and second assignments of error are, therefore, sustained.

## III

{¶ 80} Based on the foregoing, appellant's third assignment of error is moot.

{¶ 81} Accordingly, the judgment of the Perry County Common Pleas Court is reversed, and this matter is remanded to the trial court for further proceedings.

Judgment reversed
and cause remanded.

FARMER, P.J., and WISE, J., concur.