BAUERBACH et al., Appellants,

v.

LWR ENTERPRISES, INC., et al., Appellees.

[Cite as *Bauerbach v. LWR Ents., Inc.*, 169 Ohio App.3d 20, 2006-Ohio-4991.]

Court of Appeals of Ohio,
Fourth District, Washington County.

No. 05CA61.

Decided Sept. 22, 2006.

Fields & Dehmlow and Jonathan C. Dehmlow, for appellants.

Davidson, Heckler, Riggs & Fouss and Daniel A. Fouss, for appellees.

KLINE, Judge.

{¶ 1} Richard and Marian Bauerbach appeal the judgment of the Washington County Court of Common Pleas in favor of LWR Enterprises, Inc., and James Allen Porter. The Bauerbachs contend that in its ruling upon their complaint to quiet title, the trial court's finding that LWR and/or its predecessors in title lacked the necessary intent to abandon two easements over the Bauerbachs' property was against the manifest weight of the evidence. Specifically, the Bauerbachs assert that nonuse of the easements for a period in excess of 21 years, combined with the failure to maintain the pumps and water lines on the

easement and the removal of the electrical service to the water pumps, demonstrates that LWR's predecessors in title intended to abandon the easements. Because we find that the specific inclusion of the easements in numerous transfers and leases of the dominant estate and the testimony of Joseph Carson Jr. and Mr. Porter constitute some competent, credible evidence that LWR and its predecessors in title did not intend to abandon the easements, we disagree. Accordingly, we overrule each of the Bauerbachs' assignments of error and affirm the trial court's judgment.

I

{¶ 2} In October 2004, the Bauerbachs filed a complaint against LWR and its sole shareholder, Mr. Porter, seeking to quiet title to certain easements across their property that their predecessors in title, Florance J. and Margaret Arnold, conveyed to LWR's predecessors in title, the United Dairy Company, in 1935. In their complaint, the Bauerbachs alleged that (1) the easements were intended to supply water to the property now owned by LWR, (2) the wells had not been in use since LWR's predecessor in title, United Dairy, ceased its dairy operation in 1972, (3) United Dairy never used the easement that permitted it to construct pumps on the bank of the Muskingum River, and (4) United Dairy intended to abandon the easements when it ceased its dairy operations in 1972. The matter proceeded to a bench trial on September 23, 2005.

{¶ 3} In 1935, Florance J. and Margaret Arnold sold a parcel of real property located in Waterford Township, Washington County, Ohio, to the United Dairy Company (the "United Dairy property" or the "dominant estate"). In addition to conveying the parcel of real property, the 1935 deed from the Arnolds to the United Dairy Company also conveyed the following:

Also a permanent right of way from the premises first above described over and across the lands owned by Florance J. Arnold and Margaret Arnold, his wife, grantors herein, other than above described, from the premises above described to the Muskingum River, which lands lie easterly of the lands herein conveyed, for the purposes of placing thereon sewer pipe or sewer pipes, and water line or water lines; provided, however, that such water lines and sewer pipes shall be buried at least twenty-four (24) inches below the surfact [sic] of the ground, in order to permit the cultivation of the fields over which the same may pass, and said The United Dairy Company to have the right to select the points on said land and route over said land over which said sewer pipe or pipes and water line or lines may be placed, but said sewer pipes and water lines shall be placed within close proximity to each other, and said The United Dairy Company, during such time as it may maintain either said sewer pipes or water lines, shall have a right to enter upon said premises for the purpose of

repairing the same and keeping the same in good condition. [The "sewer and water pipe easement." [1]]

Said The United Dairy Company shall also have a right to erect on the river bank of the Muskingum River suitable equipment, consisting of powers and pumps to pump water from the Muskingum River to the tract of land as above described, and shall have a right to erect suitable foundations for said powers and pumps, and also a suitable building in which to house and protect such powers and pumps and shall have a right to at all times enter upon such premises for the purposes of operating such machinery as may be used for the pumping of water and the repairing and maintaining of the same, and shall have a right to pass over and across the lands of Florance J. Arnold to and from said powers and pump as at all times while the same may be maintained thereon. [The "riverbank easement."]

Also a permanent easement and right of way of so much of the land owned by the grantors herein other than above described as may be necessary for the drilling of three (3) water wells and maintaining and operating said three (3) water wells with powers to be installed nearby or adjacent thereto in the way of power pumps or motors, and the necessary equipment to operate said three (2) water wells, and to place over the same suitable protective buildings to cover and house the said pumps and the machinery in connection therewith, the said three (3) water wells to be located near the present producing test well; and also the right to maintain over the lands of the grantors herein other than above described poles to carry wires to convey electric current to the powers or pumps located at said three (3) wells, and also a right over the lands of the grantors herein other than above described to erect and maintain post to carry wires to carry electric current to the pumps to be located on the river bank, and also a right to enter on said premises for the purposes of installing said pumps, for the drilling of water wells and installing of pumps therein and installing of machinery to operate the same, and to at all times enter upon said premises for the purpose of operating said wells for the supplying of the water to the plants to be erected by the grantee herein on the lands above described and to do each and every thing necessary for the complete and proper enjoyment of the rights of pumping water either from the Muskingum River or

---

1. In its decision, the trial court calls this easement the "sewer easement," finds that the Bauerbachs' complaint does not allege that LWR or its predecessors in title have abandoned the "sewer easement," and concludes that there is nothing before the court as to the "sewer easement." However, we note that this easement also provides the right to install and maintain water lines over the servient property. Further, the Bauerbachs' complaint does not allege that this easement, as it relates to the installation and maintenance of water lines, has been abandoned.

pumping and producing water from the said three (3) wells. [The "well easement."]

{¶ 4} The deed further provides: "The rights herein given on lands of the grantors other than the lands above described shall be a covenant running with the land above described and conveyed by this deed, and shall attach thereto and be a part thereof as an easement and right over the lands of the grantors herein for the purposes above specified."

{¶ 5} In 1968, the United Dairy Company conveyed the dominant estate and the easements in question to WOS, Inc. Shortly thereafter, WOS, Inc., changed its name to United Dairy, Inc., and recorded a certificate of amendment reflecting this change in the Washington County Recorder's Office. Subsequently, United Dairy conveyed the dominant estate and the easements to Joseph M. Carson and John D. Anderson, former employees of the United Dairy, who, in turn, conveyed the dominant estate and the easements in question to United Realty Co., a partnership in which Carson and Anderson were the partners. Later, United Realty Company conveyed the property to Carson by quitclaim deed, and Carson then conveyed the dominant estate to United Dairy Realty Company, a company owned by Carson and his wife. All but two of the deeds in the above transactions specifically conveyed the riverbank and well easements at issue herein. While the property was subject to a number of conveyances over the years, it was essentially owned by United Dairy or its affiliates from 1935 until 1999, when United Dairy Realty Company sold the property to LWR Enterprises, Inc. Therefore, for purposes of this opinion, we shall refer to the owners of the United Dairy property from 1935 until LWR assumed ownership in 1999 as "United Dairy."

{¶ 6} The parties do not dispute that after taking title from the Arnolds, United Dairy began its dairy operation on the property and, pursuant to the well easement, constructed two water wells and pump houses and installed a number of poles to carry electricity to the wells on the servient property. United Dairy continued to use the well easement to provide water for its dairy operation until economic factors caused the plant to close in the early 1970s.

{¶ 7} Richard Bauerbach testified that he and his wife purchased 62 acres of land from Margaret Arnold in 1962. The Bauerbachs acknowledge that their property is the servient estate with regard to the easements described above. Mr. Bauerbach testified that when they purchased the property, there were two water wells and two pump houses on their property, with a six-inch water line running from the pumps to the United Dairy property. He indicated that while the plant was in operation, the wells provided water to both the dairy plant and the Bauerbach home. Mr. Bauerbach testified that the wells were shut down after the plant closed, and he indicated that the electricity to the pumps was cut

off approximately one year later. When the plant closed, the Bauerbachs had to drill a well for their house, develop a spring, and install a pond to provide water for their home. Mr. Bauerbach guessed that the electric wires and poles necessary to power the pumps were removed from the Bauerbach property between 1972 and 1973.

{¶ 8} Mr. Bauerbach testified that several companies, including Interlake Steel and Leif Scott, leased the United Dairy property over the years, but that to the best of his knowledge, the lessees never used water from the wells in their operations. He recalled one occasion when a man named Jim Black brought in a portable generator to test the wells and flooded a field of beans on his property. Mr. Bauerbach further testified that after the dairy ceased operations, he never observed any personnel performing maintenance on the water system that remained on his property. However, the only specific maintenance issue he cited relevant to the riverbank and well easements was that the steps to the pump houses were rusted out.

{¶ 9} Mr. Carson testified that in 1969, United Dairy hired him to run its dairy operation, which at that time included the plant on the property in Waterford, Ohio, as well as plants in Barnesville and Martins Ferry, Ohio. He stated that one of his first duties was to close the Waterford plant. Although he testified that United Dairy ceased processing canned evaporated, or "Grade B," milk at the plant in 1969, he indicated that it continued a small "Grade A" milk operation until sometime before 1975.

{¶ 10} Mr. Carson testified that he leased the property to Interlake, Inc., in 1984, and extended that lease to Interlake's successor, Globe Metallurgical, Inc., for two years in 1988. He then leased the property to Leif Scott Industries, Inc., for a four-year term in 1996. Mr. Carson testified that he did not recall any conversations with his tenants regarding use of water at the plant, although he stated that each of the leases contained the property description and the rights of way that the Arnolds granted to United Dairy in 1935. He acknowledged that he did not spend any money to maintain the easements after the dairy ceased operations, but noted that the leases were "triple net leases," which meant that the tenants were responsible for maintenance, utilities, and upkeep of the property. He stated that he believed that up until the time he sold the property, he or his company, and anyone leasing the property had the right to use the easements. Moreover, Mr. Carson testified that he never intended to abandon the easements or told anyone that he intended to abandon the easements.

{¶ 11} James Black testified that he is a retired employee of Globe Metallurgical, a division of Interlake, Inc., and that he was familiar with Globe's lease of the United Dairy property. He stated that when Globe leased the property, it did not use the wells located on the Bauerbachs' property, but brought in porta-

johns and drinking water for its employees. However, Mr. Black testified that in 1988, the company was looking for another source of water for its Beverly, Ohio, plant. At that time, he tested the water from the wells located on the Bauerbach property to determine if that water was suitable for Globe's needs. Mr. Black indicated that he helped repair some of the wiring on the pumps that had been damaged by animals, install valves that would allow the water to flow out onto the ground, and obtain a generator to perform the necessary tests. At that time, other than the damage to the wiring and some deterioration to the pump house doors, he found the pumps to be in good working order. Mr. Black indicated that the results of the testing demonstrated that the water on the Bauerbachs' property did not meet the company's requirements. However, he stated that if the water had been of sufficient quantity or quality, Globe would have sought a right of way to move volumes of water to its Beverly plant.

{¶ 12} Mr. Porter testified that in 1999, he purchased his business from Leif Scott Industries, which had been leasing the United Dairy property. At that time, he called Mr. Carson and inquired about purchasing the property. He was aware of the easements before purchasing the property and he indicated that the easements were a "big factor" in his purchase of the property. He recalled telling Mr. Carson that one of the reasons he was interested in purchasing the property was the good water wells that came with the property. Mr. Porter stated that he believed that the purchase price included the easements and that in their discussions, Mr. Carson gave him no indication that the easements were abandoned or invalid. Mr. Porter testified that he put one of the wells into operation in August or September 2004. He installed a two-inch water line and a new electric line inside the six-inch pipe that previously carried water to the dairy operation. Because the original pump was too large for his company's needs, Mr. Porter also installed a new, smaller, pump to service the well. Additionally, Mr. Porter testified that he removed some of the steps from the pump houses and installed a lock in an effort to secure the pump houses against trespassers.

{¶ 13} After considering the evidence, the trial court essentially found that LWR and/or its predecessors in title never used the riverbank easement, but determined that they had no intent to abandon the riverbank easement. Additionally, the court found that LWR and/or its predecessors in title used the well easement over the years and that they had no intent to abandon the well easement. Accordingly, the trial court rendered a decision in favor of LWR Enterprises, Inc., and Mr. Porter.

{¶ 14} The Bauerbachs timely appeal, raising the following assignments of error: "I. The trial court's ruling that the water well easement granted to united dairy had been used and that there was not an intent to abandon the easement was against the manifest weight of the evidence and was therefore reversible

error." "II. The trial court's ruling that there was not an intent to abandon the river bank easement was against the manifest weight of the evidence and was therefore reversible error."

## II

{¶ 15} Because both of the Bauerbachs' assignments of error involve the trial court's determination that LWR and/or its predecessors in title did not intend to abandon the easements over the Bauerbachs' property, we address them together.

{¶ 16} In their first assignment of error, the Bauerbachs contend that the trial court's findings that the owners of the United Dairy property used the water-well easement and that they did not intend to abandon the water-well easement were against the manifest weight of the evidence. Specifically, the Bauerbachs contend that the wells were used only one time after the dairy operation ceased and that because that use was not intended for the benefit of the dominant estate, it equated to use by a trespasser. Additionally, the Bauerbachs contend that United Dairy evidenced its intent to abandon the water-well easement by (1) closing the dairy operation, (2) permanently laying off its workforce, (3) removing the poles and wires necessary to supply electricity to the pumps, (4) having no future plans for the plant, (5) failing to perform any maintenance on the wells, pumps, or pump houses or to have a budget for that maintenance, and (6) failing to market the property.

{¶ 17} In their second assignment of error, the Bauerbachs contend that the trial court's finding that the owners of the United Dairy property did not intend to abandon the riverbank easement is against the manifest weight of the evidence. Specifically, the Bauerbachs argue that the owner of a dominant estate must perform some minimal acts to further the use of an easement and, therefore, the complete failure of the owners of the United Dairy property to make any effort to utilize the riverbank easement for more than 70 years plainly demonstrates their intent to abandon the riverbank easement.

{¶ 18} In order to demonstrate that the owner of a dominant estate has abandoned an easement, the owner of the servient estate must establish both (1) nonuse of the easement and (2) an intent to abandon the easement. *Crane Hollow v. Marathon Ashland Pipe Line, L.L.C.* (2000), 138 Ohio App.3d 57, 72, 740 N.E.2d 328, citing *Snyder v. Monroe Twp. Trustees* (1996), 110 Ohio App.3d 443, 457, 674 N.E.2d 741; *Scott v. Columbia Gas* (Apr. 5, 2000), Lorain App. No. 98CA7241, 2000 WL 354132; *McCarley v. O.O. McIntyre Park Dist.* (Feb. 11, 2000), Gallia App. No. 99CA7, 2000 WL 203997.

{¶ 19} The intent to abandon an easement must be "demonstrated by 'unequivocal and decisive acts' inconsistent with the continued use and enjoyment of the easement." Id., quoting *Snyder*, 110 Ohio App.3d at 458, 674 N.E.2d 741, citing *Warner v. Thompson* (Sept. 27, 1993), Fayette App. No. CA93–02–002, 1993 WL 386252, citing *Schenck v. Cleveland, Cincinnati, Chicago & St. Louis Ry. Co.* (1919), 11 Ohio App. 164, 167. Thus, mere nonuse of an easement is generally insufficient to establish abandonment. *Crane*, 138 Ohio App.3d at 72, 740 N.E.2d 328, citing *Snyder*, 110 Ohio App.3d at 457, 674 N.E.2d 741; *Langhorst v. Riethmiller* (1977), 52 Ohio App.2d 137, 140–141, 6 O.O.3d 101, 368 N.E.2d 328. While nonuse for a period equal to or exceeding the 21–year prescriptive period for adverse possession may give rise to an inference of intention to abandon an easement, such nonuse "may be accompanied by other facts and circumstances which either weaken or strengthen it." *Tudor Boiler Mfg. Co. v. I. & E. Greenwald Co.* (1904), 5 Ohio C.C. (N.S.) 37, citing *Kelly Nail & Iron Co. v. Lawrence Furnace Co.* (1889), 46 Ohio St. 544, 22 N.E. 639.

{¶ 20} Whether an easement has been abandoned is a question of fact. *Crane*, 138 Ohio App.3d at 72, 740 N.E.2d 328, citing *McCarley*, supra. See, also, *Methodist Protestant Church of Cincinnati v. Laws* (1893), 55 Ohio St. 662, 48 N.E. 1114. An appellate court will not reverse a trial court's factual findings unless they are against the manifest weight of the evidence. *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578, syllabus. A judgment is not against the manifest weight of the evidence when the record contains some competent, credible evidence going to all the essential elements of the case. Id.

{¶ 21} Here, the Bauerbachs contend that the trial court improperly found that (1) the well easement was used during the relevant 21–year period and (2) LWR and/or its predecessors in title did not intend to abandon the well and riverbank easements. The parties devote a great deal of their briefs to arguing about whether Globe's testing of the wells in 1988 for purposes other than providing water to the United Dairy property, constituted a "use" of the easement sufficient to interrupt the otherwise extended nonuse of the well easement. However, we decline to resolve that issue because regardless of whether that testing constituted a "use" of the well easement, the trial court specifically found that LWR and its predecessors in title had no intent to abandon either the well or riverbank easements.

{¶ 22} Pursuant to our holding in *Crane*, supra, both nonuse and intent to abandon are necessary for a court to find an easement abandoned. Thus, if LWR and/or its predecessors in title did not evince the requisite intention to abandon the easements, the one-time use of the well easement in 1988 is inapposite. Further, because our review of the trial court's decision is limited to the manifest

weight of the evidence, we must uphold the trial court's judgment if the record contains some competent, credible evidence to support the trial court's finding that LWR and/or its predecessors did not intend to abandon the well and riverbank easements. *C.E. Morris Co.*, supra. In conducting our review, we must make every reasonable presumption in favor of the trial court's findings of fact. *Myers v. Garson* (1993), 66 Ohio St.3d 610, 614, 614 N.E.2d 742. We must not reweigh the evidence or substitute our judgment for that of the trial court. *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 80, 10 OBR 408, 461 N.E.2d 1273. We give deference to the trial court as the trier of fact because it is "best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." Id.

{¶ 23} The Bauerbachs urge us to consider the evidence in the record that could arguably support a finding that LWR and/or its predecessors in title intended to abandon the well easement, namely United Dairy's removal of the poles and wires that carried electricity to the well pumps when the dairy ceased operations. However, based upon our standard of review, we must direct our focus to whether the record contains some competent, credible evidence to support the trial court's finding that LWR and/or its predecessors did not intend to abandon the well easement.

{¶ 24} We note that the easements at issue here were created for the benefit of the owner of the United Dairy property and therefore are appurtenant to the land. See, e.g., *DeShon v. Parker* (1974), 49 Ohio App.2d 366, 367, 3 O.O.3d 430, 361 N.E.2d 457. As such, they pass with ownership of the dominant estate, as an incident thereto, without any mention of the easements or appurtenances. *Shields v. Titus* (1889), 46 Ohio St. 528, 540, 22 N.E. 717, citing *Morgan v. Mason* (1851), 20 Ohio 401, 411. But, the record reflects that of six deeds transferring ownership of the United Dairy property since the easements were created in 1935, four of those deeds specifically recite the easements at issue. While the quitclaim deed from United Realty Co. to Mr. Carson and the warranty deed from Mr. Carson to United Dairy Realty Co., both of which were recorded on August 16, 1988, fail to mention the easements, the 1999 deed conveying the property to LWR once again contains the full description of the easements. This reinsertion of the easement descriptions after having omitted them from several deeds constitutes some evidence that United Dairy had no intention to abandon the easements in question.

{¶ 25} The record further reflects that United Dairy specifically assigned the easements when it leased the property to Interlake, Inc., in 1984, which lease the parties thereto extended in 1986 and 1988, and again when it leased the property to Leif Scott Industries, Inc., in 1996. United Dairy also specifically included the

easements in the option to purchase the property that it granted Leif Scott Industries, Inc., in 1996.

{¶ 26} Additionally, Mr. Carson, who began working for United Dairy in 1969 and who had an ownership interest in the property from 1983 until 1999, testified that until he sold the property, he believed that he or his company and anyone leasing the property had the right to use the easements. He further testified that he had never intended to abandon the easements or told anyone that he intended to abandon the easements and that no one from his company had the authority to do so. Mr. Porter's testimony regarding his conversations with Mr. Carson contemporaneous with LWR's purchase of the property corroborate Mr. Carson's testimony.

{¶ 27} Furthermore, the record reveals that while United Dairy removed the poles and wires that supplied electricity to run the pumps, it left the pumps, pump houses, and water line in place. And, even though United Dairy did not perform routine maintenance on the equipment, Mr. Black's testimony revealed that with little effort, the pumps were returned to working order for Globe's 1988 testing. Thus, the trial court could reasonably have concluded that the removal of the poles and wires from the Bauerbachs' property at the time the dairy ceased operation did not indicate an intention to abandon the easement, but rather signified an effort to secure the Bauerbach property from potentially dangerous conditions during an extended period of nonuse.

{¶ 28} Based upon the foregoing, we conclude that some competent, credible evidence supports the trial court's findings that LWR and/or its predecessors in title did not intend to abandon either the well or the riverbank easements. Accordingly, we overrule each of the Bauerbachs' assignments of error and affirm the trial court's judgment.

Judgment affirmed.

HARSHA, P.J., and ABELE, J., concur.