[Cite as *State v. Suber*, 2011-Ohio-2396.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

---

### JOURNAL ENTRY AND OPINION
### No. 95455

---

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## NATASHA SUBER

DEFENDANT-APPELLANT

---

## JUDGMENT:
## AFFIRMED

---

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-527521

**BEFORE:** Jones, J., Kilbane, A.J., and S. Gallagher, J.

**RELEASED AND JOURNALIZED:** May 19, 2011

ATTORNEY FOR APPELLANT

John T. Castele
1310 Rockefeller Building
614 West Superior Avenue
Cleveland, Ohio 44113


ATTORNEYS FOR APPELLEE

William D. Mason
Cuyahoga County Prosecutor

BY: Sherrie S. Royster
Assistant Prosecuting Attorney
The Justice Center, 8th Floor
1200 Ontario Street
Cleveland, Ohio 44113


LARRY A. JONES, J.:

{¶ 1} Defendant-appellant, Natasha Suber ("Suber"), appeals her conviction for felonious assault and possession of criminal tools. Finding no merit to the appeal, we affirm.

Procedural History and Facts

{¶ 2} In 2009, Suber was charged with felonious assault and possession of criminal tools. The matter proceeded to a jury trial, at which the following pertinent evidence was presented.

**{¶ 3}** On August 7, 2009, Thomas Campbell ("Campbell"), an experienced motorcyclist, was riding his Ninja motorcycle with his wife on the back. He was traveling on Superior Avenue in East Cleveland. Riding next to the couple were Campbell's son and daughter-in-law, also on a motorcycle. Campbell saw a car, later identified as Suber's, drive up behind him. Both motorcycles moved from the left lane into the right lane and the car "shot past" the motorcycles in the left-hand lane. The car quickly returned to the right-hand lane, clipping the front of Campbell's motorcycle. Campbell swerved, but was able to maintain control of his bike.

**{¶ 4}** Suber kept driving and stopped at a red light a few blocks further on Euclid Avenue. Campbell rode up to Suber's car, got off his bike, took off his helmet, and approached the car. He tapped on the window and told Suber, who was on her cell phone, that she had hit him. She yelled at him. Campbell then went in front of Suber's car to take down the license plate number. Suber revved her engine and edged her car forward as if, Campbell testified, she was trying to hit him. Campbell jumped to the side and put both of his hands on the car. Campbell testified that Suber "did a doughnut," coming back towards him, hitting the inside of his leg with her car and then running into his motorcycle. After she hit the motorcycle, she put her car in reverse, backed up and tried, Campbell testified, to hit him again. He was able to jump out of the way but she again hit his leg and hit his motorcycle. She backed her car up and sped away.

{¶ 5} Campbell testified he stood up and looked for his helmet, but was unable to find it.  He stood his motorcycle up and tried unsuccessfully to start it.   He then saw Suber's car racing back towards him.   She cut across oncoming traffic and hit the motorcycle, knocking it up onto the sidewalk.   Her car came to rest on top of a curb with the tire off its rim.

{¶ 6} Campbell testified that he then heard a man's voice coming through the crowd that had gathered, yelling "that's my baby's mother."   The man pulled his shirt over his head, in an apparent sign he wanted to fight Campbell.   Campbell saw two other men with the first, one held a gun and the other held a jack handle.   The men heard sirens and fled.   Campbell admitted that once the police arrived, they had to subdue him and he ended up being arrested. Campbell explained that he was charged with felonious assault and resisting arrest in connection with the incident but the assault charge against him was later dismissed and he pleaded guilty to resisting arrest.   He denied ever having a knife or attacking Suber.

{¶ 7} Deaunna Campbell, Campbell's wife, testified that she was riding on the back of her husband's motorcycle when Suber clipped the motorcycle, causing it to swerve.   Deaunna saw her husband approach Suber's car but did not hear all of the conversation.   She stated five men arrived to fight her husband but three of the men ran off when police came.   She explained that her husband had not listened to police orders because he thought his wife was in danger.

{¶ 8} Larry Walker ("Walker") testified that he was waiting in his car for his fiancée

to get off work from Taco Bell. He heard tires screeching and then saw Suber hit Campbell's motorcycle with her car. He testified that he saw the car hit the motorcycle again, speed away, and come back and hit the motorcycle a third time. He also witnessed four men pull up in another car. He saw one man pull a gun out of the back seat of the car. When the man with the gun heard sirens, he put the gun in the trunk. Walker further testified that he witnessed Deaunna Campbell throw a motorcycle helmet at Suber's window and the helmet shattered the car window. At one point Walker saw Campbell reach into the driver's side window to try and turn the car off, but did not see Campbell with a weapon. Walker stated that he did not know any of the parties involved.

{¶ 9} Virginia Gray ("Gray"), Walker's fiancée, testified she saw Suber's car driving in circles and heard the tires spinning. She witnessed the car hit the motorcycle once, leave and then come back and hit the motorcycle again. Gray testified that Suber's car "jumped" over the curb in a parking lot to get at the motorcycle. She also witnessed a car pull up with four men and saw one man get out with a gun and then later put the gun into the trunk of the car. Gray testified she heard Campbell tell police he would not comply with their orders until Suber turned her car off because she was "trying to hit him." Gray witnessed the police use their taser to subdue Campbell. Like Walker, she did not know any of the parties involved.

{¶ 10} Officer Robert Bailey of the East Cleveland police testified that he arrived on the scene and saw that Suber had an injury to her arm. Officer Bailey initially thought Suber was

the victim because Suber told him that Campbell was shouting obscenities at her and "busted" her car window. Suber told the officer that Campbell then reached inside her car and she felt something hit her arm and noticed she was bleeding. Suber told the officer she tried to run Campbell over in an attempt to stop him from assaulting her.

{¶ 11} Sergeant Kyle Cunningham ("Cunningham") testified that he interviewed Suber a few days after the incident. Suber told him that Campbell came up to her car and yelled at her. She yelled back and then Campbell punched her car window out. Suber told the sergeant that that was when "she lost it." She told the sergeant she drove off to a gas station, called her boyfriend, and only went back to the scene to prevent her boyfriend from fighting with Campbell. She drove between Campbell and her boyfriend and it was at this point that Campbell cut her on her arm with a knife.

{¶ 12} Cunningham testified that he asked Suber why she told him a different story from the one she told to Officer Bailey. Suber insisted that she got cut when she was in between her boyfriend and Campbell. Cunningham testified regarding pictures from the incident, including photographs of the damaged blue motorcycle that showed "small patterns of red paint transfer" from Suber's car. As part of the investigation, Cunningham explained that the police never recovered a knife or a gun and that while both Gray and Walker stated they had seen a gun, they never saw Campbell with a knife. Cunningham concluded that Suber should be arrested in connection with the incident.

{¶ 13} At some point during his investigation, Cunningham spoke to Deaunna Campbell, who admitted to throwing her husband's helmet through Suber's car window.

{¶ 14} Angelic Suber, appellant's sister, testified that she took pictures of her sister's arm when she was in the hospital and of her sister's car after removing it from the impound lot. She testified that the front right tire had a gash in it. Angelic Suber disagreed with prior testimony from police officers that the tire did not have a gash in it when it was towed.

{¶ 15} Melvin Pollard testified that he was with Suber's boyfriend, Anthony Wiley ("Wiley"), the night of the incident. He heard Wiley arguing on the phone with Suber. He heard Wiley say that somebody broke Suber's window. He stated that he drove with Wiley to Taco Bell. They got out of the car and saw Campbell pull out a knife and swing it towards them. He testified that he saw Campbell reach into Suber's car and heard her scream "[h]e cut my arm!" Wiley denied ever having a gun. On cross-examination, Pollard explained his version of the sequence of events: he saw Campbell pull out a knife, wave it around wildly, cut Suber's passenger-side tire, jump over her hood, and reach into her car and cut her on her arm. He further testified that Cunningham was "lying" when he put in his report that Pollard told him that Suber tried to hit the motorcycle with her car.

{¶ 16} Wiley testified that when he arrived on the scene, he saw that Suber's car window had been "busted out." He approached Campbell, who became hostile and pulled out a knife. Wiley testified that Suber pulled her car in between him and Campbell, and then

Campbell ran up to the car, threw his helmet into the car, and cut Suber's arm. He denied seeing Campbell jump or slide over the car hood.

{¶ 17} Suber testified in her own defense that she was at a stop light when she first saw Campbell. He was walking up to her driver side window, yelling. She revved her engine and Campbell began punching her window. Suber testified she did a u-turn, not a doughnut, attempting to get away from Campbell, whom she thought was high or drunk. As she was trying to drive away from Campbell, he again punched her window, breaking it. Suber drove to a gas station and got out of her car because she felt as though her tire was "wobbly." She testified that, at that time, she did not see the slit in her tire. She called Wiley and told him "a man just punched out my window." She then got back into her car and drove back towards the scene where she saw Wiley and Campbell arguing. She saw Campbell pull out a knife and decided to drive between the two men, attempting to break up the confrontation. She called 911, and right after making the call, Campbell cut her on her left arm with a knife. She testified that she does not know how Campbell's helmet ended up in her passenger seat and claimed she never hit Campbell or his motorcycle with her car. Suber stated that she did not run her car up onto a fire hydrant or curb, but rather parked her car. Suber further maintained that the officers took her statement incorrectly.

{¶ 18} The 911 tapes were played for the jury, but were not admitted into evidence. In Suber's call to 911, she told the dispatcher that a man had "busted" out her car window, was

"acting crazy," and she was "very scared." One unknown caller said "somebody just got hit on a motorcycle on Euclid Avenue," another caller stated "people are running motorcycles over" and "people have knives," while a third anonymous caller said Suber was going "ballistic, she hit this guy's bike, she almost hit him," "she's using her car as a weapon," and "she's going to kill somebody."

{¶ 19} The jury convicted Suber of felonious assault and possession of criminal tools as charged in the indictment. The trial court sentenced Suber to one-year of community control sanctions.

{¶ 20} Suber filed her notice of appeal and now raises the following assignments of error:

"I. The jury's verdict was against the manifest weight of the evidence.

"II. The defendant was deprived her right to a fair trial when a defense witness was arrested in the courtroom in front of the jury immediately after his testimony."

Manifest Weight of the Evidence

{¶ 21} While the test for sufficiency of the evidence requires a determination of whether the prosecution has met its burden of production at trial, a manifest weight challenge questions whether the prosecution has met its burden of persuasion. *State v. Thompkins*, 78 Ohio St.3d 380, 390, 1997-Ohio-52, 678 N.E.2d 541. When considering a manifest weight claim, a reviewing court must examine the entire record, weigh the evidence, and consider the credibility of witnesses. *State v. Thomas* (1982), 70 Ohio St.2d 79, 80, 434 N.E.2d 1356.

The court may reverse the judgment of conviction if it appears that the fact finder "'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717. A judgment should be reversed as against the manifest weight of the evidence "only in the exceptional case in which the evidence weighs heavily against the conviction." *Thompkins* at id.

{¶ 22} Suber argues that the jury clearly lost its way in convicting her because she was a victim of Campbell's "road rage." Although we recognize various inconsistencies in the witnesses' trial testimony, these minor inconsistencies do not render all testimony unbelievable. Other evidence, including the testimony of disinterested eyewitnesses, corroborated the Campbells' testimony. The jury is in the best position to view witnesses, to observe the witnesses' demeanor, gestures, and voice inflections and to use those observations to weigh witness credibility. See *Myers v. Garson* (1993), 66 Ohio St.3d 610, 615, 614 N.E.2d 742; *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 80, 461 N.E.2d 1273. As such, a trier of fact may choose to believe all, part, or none of the testimony of any witness who appears before it. *Rogers v. Hill* (1998), 124 Ohio App.3d 468, 470, 706 N.E.2d 438; *Stewart v. B.F. Goodrich Co.* (1993), 89 Ohio App.3d 35, 42, 623 N.E.2d 591.

{¶ 23} In this case, the jury opted to believe the state's witnesses over those for the defense. It is the jury that must consider and resolve conflicts in the evidence; as this is within

the jury's purview as trier of fact, we will not disturb that determination. Further, just as there were discrepancies in the testimony of the state's witnesses, there were also discrepancies in the witnesses for the defense. Although it remains unclear how Suber sustained a cut to her arm, who or what caused the hole in her tire, or just how Campbell's helmet ended up in Suber's car, those questions are not dispositive to whether her convictions were against the manifest weight of the evidence. Moreover, "a defendant will not be entitled to reversal on manifest weight or insufficient evidence grounds merely because inconsistent testimony was heard at trial." *State v. Raver*, Franklin App. No. 02AP-604, 2003-Ohio-958.

{¶ 24} As an appellate court, it is not our role to substitute our judgment for the trier of fact on issues related to witness credibility. We do not find that the jury verdict created such a manifest miscarriage of justice as to require reversal of the convictions.

{¶ 25} Therefore, the first assignment of error is overruled.

Arrest of Witness

{¶ 26} In the second assignment of error, Suber argues that because a defense witness was arrested mid-trial in front of the jury, her rights to due process and a fair trial were violated. We disagree.

{¶ 27} The record shows that prior to Wiley's testimony, the court was made aware that he had an outstanding warrant for an unrelated matter. The court directed the state to make sure that Wiley was not arrested in front of the jury. Suber maintains that as the jury was

filing out for a recess, Wiley could be seen arguing with a deputy sheriff. Although it is not apparent from the record if any of the jurors saw Wiley arguing with the deputy, the trial court decided to give a curative instruction to the jury. The trial court told the jury:

> "The witness was taken by the deputy sheriffs because of an error. There was a mistake as to his status. That has been cleared up. It had nothing to do with this case. It had nothing to do with his testimony or with anything — anything involving this case at all. And as I say, it was a mistake.

> "I apologize to any of you who may have been concerned by what you saw. And please do not let that affect, one way or another, your evaluation of the witness, his testimony or of anything else that may have occurred or will occur in this trial.

> "I want to emphasize that because the issues that we have to deal with here are, of course, very serious. And I just want to make sure that your verdict at the end of the trial is based only on the evidence in this case and not on anything extraneous that you may have seen."

{¶ 28} Although defense counsel mentioned she might ask for a mistrial prior to the curative instruction, she never did ask for a mistrial or otherwise object to what happened. Therefore, Suber has not properly preserved the issue for appellate review and, consequently, we review solely for plain error.

{¶ 29} A jury is presumed to follow instructions, including curative instructions, given to it by a trial judge. *State v. Elko*, Cuyahoga App. No. 83641, 2004-Ohio-5209; *State v. Hardwick*, Cuyahoga App. No. 79701, 2002-Ohio-496. Absent any showing otherwise, we see no reason to find that the jury failed to follow the trial court's instructions. Suber has

failed to demonstrate how she was prejudiced such that the trial court's curative instruction was inadequate; therefore, we find no plain error was committed.

{¶ 30} The second assignment of error is overruled.

Accordingly, judgment is affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

LARRY A. JONES,   JUDGE

MARY EILEEN KILBANE, A.J., and
SEAN C. GALLAGHER, J., CONCUR