[Cite as *Wilson v. Rowe*, 2016-Ohio-523.]

COURT OF APPEALS
KNOX COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| BALEIGH WILSON | : | JUDGES: |
| | : | |
| Petitioner-Appellee | : | Hon. John W. Wise, P.J. |
| | : | Hon. Patricia A. Delaney, J. |
| | : | Hon. Craig R. Baldwin, J. |
| -vs- | : | |
| | : | Case No. 15-CA-14 |
| | : | |
| MICHAEL D. ROWE | : | |
| | : | |
| | : | |
| Respondent-Appellant | : | O P I N I O N |

CHARACTER OF PROCEEDING:     Appeal from the Knox County Court of
                             Common Pleas, Case No. 15ST04-0130

JUDGMENT:                    AFFIRMED

DATE OF JUDGMENT ENTRY:      February 11, 2016

APPEARANCES:

For Plaintiff-Appellee:              For Defendant-Appellant:

BALEIGH WILSON, PRO SE               ANDREW T. SANDERSON
10 Kenyon St.                        BURKETT & SANDERSON, INC.
Mount Vernon, OH 43050               73 North Sixth St.
                                     Newark, OH 43055

*Delaney, J.*

{¶1}   Respondent-appellant Michael D. Rowe appeals from the Full Hearing Civil Stalking Protection Order issued by the Knox County Court of Common Pleas on July 30, 2015.  Petitioner-appellee Baleigh Wilson did not file a brief.

## FACTS AND PROCEDURAL HISTORY

{¶2}   The following facts are adduced from the hearings of June 22 and July 30, 2015, upon appellee's petition for a civil protection order.

{¶3}   In early 2015, a Facebook post appeared in reference to allegedly abused dogs in Knox County.  The post contained information about dogs left out in the cold and advised readers to contact police, mayors, and dog wardens to rescue the dogs.  The post also listed residence addresses where the dogs could be found.  One address listed was that of Shawn Brown, the former stepfather of Doug Wilson ("Doug").  Doug is married to Baleigh Wilson ("Baleigh") and they have three children under the age of five.  Doug and Baleigh live two doors down from Brown.

{¶4}   The Facebook posting created a buzz in the community and Baleigh testified the neighborhood was inundated with people driving around Brown's house to check on the dog.  Appellant was admittedly one of those people.  After reading the Facebook post, appellant called the dog warden to check Brown's dog's status and was told the dog was now kept inside the house.  Appellant drove past Brown's house to check for himself.  On February 3, 2015, around 12:00 or 1:00 p.m., appellant drove past Brown's address.  He didn't see the dog on the front porch and so drove through an alley behind Brown's house to check the status of a second dog.  He didn't see any dogs

outside. Appellant acknowledged he looked through a gap in Brown's privacy fence to see into the backyard.

{¶5} Baleigh and Doug were admittedly frustrated by people driving around the block and making threats. On February 3rd, they observed appellant circle the block twice. Baleigh and Doug were in their vehicle and saw appellant leave the alley and turn onto Miami. Doug and Baleigh were also on Miami. They pulled over to the right side of the road and flagged appellant down. Doug went to appellant's passenger-side window and told him he didn't have to worry about Brown's dog because it was taken care of and to stop circling the neighborhood. Doug then returned to his own car.

{¶6} Appellant testified that during this exchange, Doug threatened to "throw a brick through his window" and when Doug returned to his car appellant thought he was retrieving a brick or other weapon. Doug denied making the threat.

{¶7} As Doug returned to the car, Baleigh got out of the passenger side and told appellant to keep moving. Appellant pulled a gun that he had concealed at his waist and pointed it at Baleigh. Appellant said he felt threatened and that the Wilsons were "in his space."

{¶8} Baleigh started screaming when she saw the gun and Doug yelled for appellant to put the gun down. Shawn Brown came out of his house and got in between appellant and Baleigh; Brown purportedly told appellant he was an Iraqi war vet and "could take him down if [he] wanted to do so." Brown yelled for appellant to put the gun down. Doug called 911 and police arrived within 5 or 10 minutes. Police instructed appellant to place the gun on the hood of his vehicle and he complied.

{¶9} Appellant testified he did not pull his weapon until Brown also appeared on the scene and he felt threatened by three against one. He acknowledged he could have gone around the Wilsons' car and avoided them altogether but he stopped because he wanted to "see what was going to happen." (T. 38). The trial court questioned why, once the confrontation started, appellant didn't get in his car and leave instead of pulling a gun, but appellant said he just "reacted;" also, Doug's car door was open and the road was icy and appellant didn't want to hit him.

{¶10} Appellant was criminally charged with two counts of aggravated menacing for the gun incident and reportedly entered a no-contest plea to a single count of minor misdemeanor disorderly conduct.

{¶11} On March 6, 2015, appellant reportedly drove past the Wilson house repeatedly, honking his horn. The Wilsons made a police report. Appellant denied this incident and said the browsing history on his home computer supports his contention that he and his wife were watching a movie during the time period Doug alleged they drove by.

{¶12} On March 31, 2015, Doug was driving on Miami when appellant and his wife walked by. Appellant waved at Doug. Appellant admitted this occurred; he testified he had a pretrial in his criminal case that day but he and his wife frequently walk in that neighborhood. Appellant acknowledged he did wave at Doug but said it was a friendly gesture because Doug allowed them to cross the street in front of his car.

{¶13} On April 4, 2015, Doug saw appellant while he was driving and appellant yelled at him that Doug should get an attorney. Appellant denied this incident.

{¶14} On April 17, 2015, Baleigh was driving on Beech Street when appellant pulled out behind her on a motorcycle. Appellant's wife was his passenger on the motorcycle and they followed Baleigh down the road until they stopped at a traffic light. Appellant started repeatedly yelling at Baleigh, "I'm a liar and I'm a Christian." Baleigh testified appellant's wife told him to stop. Baleigh pulled into a Kroger's parking lot and called the police to document the incident. Appellant was still yelling while Baleigh was on the phone with police.

{¶15} Appellant acknowledged this incident but claimed he was in the midst of a disagreement with his wife when he was yelling that he was "a Christian and a liar." He saw Baleigh pull into the Kroger parking lot and he and his wife proceeded on their way to dinner.

{¶16} Appellant denied that he saw either of the Wilsons at any other time. He testified, though, that he was in the neighborhood frequently over a period of weeks gathering evidence because his attorney told him to get photos and videos of the scene of the February 3 incident.

{¶17} Baleigh filed a pro se motion for a civil stalking protection order on behalf of herself, Doug, and their three children. An ex parte order was granted on April 23, 2015 and expired on May 25, 2015. The parties appeared before the trial court for a full hearing on June 22, 2015 and appellant's attorney presented the trial court with a signed agreement that purported to resolve the matter without a hearing. Appellant's attorney drafted the settlement agreement. The written document, signed by all of the parties, stated in part appellant would not walk, drive, or otherwise pass in front of the Wilsons' house. The trial court pointed out that the order was unenforceable and appellant's

attorney responded the parties could file again for protection orders if the agreement was breached.

{¶18} Baleigh stated she agreed to the settlement agreement because she knew appellant intended to file his own petition for a civil stalking protection order against the Wilsons and she feared the trial court would not take the matter seriously, thus this was possibly the best resolution she could hope for.

{¶19} The trial court stated it was concerned about the February 3 incident because appellant pulled a gun.  The trial court said it would not accept the settlement agreement because it purported to resolve the matter with an unenforceable order.  When the trial court indicated its intent to proceed with the hearing upon the civil stalking protection order, appellant requested a continuance.  The trial court permitted a continuance of two weeks and extended the ex parte civil protection order in the meantime.

{¶20} The full hearing took place on July 30, 2015.  At the conclusion of the hearing, the trial court granted the civil stalking protection order on behalf of the Wilsons.

{¶21} Appellant now appeals from the civil stalking protection order issued July 30, 2015.

{¶22} Appellant raises two assignments of error:

### ASSIGNMENTS OF ERROR

{¶23} "I.   THE GRANTING OF THE MENACING BY STALKING CIVIL PROTECTION ORDER WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE TO SUSTAIN THE SAME."

{¶24} "II.  THE TRIAL COURT COMMITTED HARMFUL ERROR IN REJECTING THE SETTLEMENT OF THE PARTIES REGARDING THE DISMISSAL OF THE REQUEST FOR A CIVIL STALKING PROTECTION ORDER."

**ANALYSIS**

I.

{¶25} In his first assignment of error, appellant argues the civil stalking protection order is not supported by sufficient evidence.  We disagree.

{¶26} Appellant argues the record falls short of demonstrating a pattern of conduct that created any fear of physical harm or mental distress to the Wilsons.  We find sufficient evidence in the record to support the Wilsons' fear of physical harm.

{¶27} R.C. 2903.214 governs the filing of a petition for a civil stalking protection order. R.C. 2903.214(C) provides: "A person may seek relief under this section for the person, or any parent or adult household member may seek relief under this section on behalf of any other family or household member by filing a petition with the court."  To be entitled to a civil stalking protection order, the petitioner must show by a preponderance of the evidence that the respondent engaged in menacing by stalking, a violation of R.C. 2903.211, against the person seeking the order. See *Tumblin v. Jackson,* 5th Dist. Coshocton No. 06CA002, 2006–Ohio–3270, ¶ 17.  R.C. 2903.211(A), menacing by stalking, states that "[n]o person by engaging in a pattern of conduct shall knowingly cause another to believe that the offender will cause physical harm to the other person or cause mental distress to the other person."  R.C. 2903.211(D)(1) defines "pattern of conduct" as two or more actions or incidents closely related in time, whether or not there has been a prior conviction based on any of those actions or incidents.

{¶28} "R.C. 2903.211(D)(1) does not require that a pattern of conduct be proved by events from at least two different days. Arguably, a pattern of conduct could arise out of two or more events occurring on the same date, provided that there are sufficient intervals between them." *State v. Scruggs,* 136 Ohio App.3d 631, 634, 737 N.E.2d 574 (2nd Dist.2000). One incident is insufficient to establish a "pattern of conduct." Id*.* The statute does not define the term "closely related in time," but case law suggests the trier of fact should consider the evidence in the context of all circumstances of the case. *Middletown v. Jones,* 167 Ohio App.3d 679, 856 N.E.2d 1003, 2006–Ohio–3465, ¶ 10 (12th Dist.). Trial courts may take every action into consideration, even if some actions in isolation would not seem particularly threatening. *Guthrie v. Long,* 10th Dist. No. 04AP–913, 2005–Ohio–1541, ¶ 12.

{¶29} The decision whether to grant a civil protection order lies within the sound discretion of the trial court. *Olenik v. Huff,* 5th Dist. No. 02–COA–058, 2003–Ohio–4621, ¶ 21. Therefore, an appellate court should not reverse the decision of the trial court absent an abuse of discretion. In order to find an abuse of discretion, this court must determine that the trial court's decision was unreasonable, arbitrary or unconscionable and not merely an error of law or judgment. *Blakemore v. Blakemore,* 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶30} We further note that a judgment supported by some competent, credible evidence will not be reversed by a reviewing court as against the manifest weight of the evidence. *C.E. Morris Co. v. Foley Construction Co.,* 54 Ohio St.2d 279, 280, 376 N.E.2d 578 (1978). A reviewing court must not substitute its judgment for that of the trial court where there exists some competent and credible evidence supporting the judgment

rendered by the trial court. *Myers v. Garson,* 66 Ohio St.3d 610, 614 N.E.2d 742 (1993). The underlying rationale for giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of the proffered testimony. *Seasons Coal Co. v. City of Cleveland,* 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984).

{¶31} In this case, the Wilsons were placed in fear of physical harm when appellant pointed a gun at them on February 3. We held in *Coleridge v. Tomsho,* 5th Dist. No.2002CA00280, 2003–Ohio–650, that R.C. 2903.211 was written in the disjunctive. *Madison v. Wilborn*, 5th Dist. Stark No. 2011CA00247, 2012-Ohio-2742, ¶ 33. A petitioner can establish a fear of physical harm or mental distress. "Physical harm" includes "any injury, illness, or other physiological impairment, regardless of its gravity or duration." R.C. 2901.01(A)(3).

{¶32} The trial court was alarmed by the circumstances of this case, especially by appellant's willingness to pull a gun when he could have avoided any confrontation whatsoever. As we have frequently observed, "civil stalking protection order cases most often turn on the credibility of the witnesses." *Madison v. Wilborn,* 5th Dist. Stark No.2011 CA00247, 2012–Ohio–2742, ¶ 34; *Kruszynski v. Kruszynski,* 5th Dist. Fairfield No. 12–CA–133, 2013–Ohio–3355, ¶ 21. We note in this case, however, beyond issues of credibility, appellant's admissions of his conduct toward the Wilsons support the findings of the court below. *Elkins v. Reed*, 5th Dist. Stark No. 2013CA0091, 2014-Ohio-1217, ¶ 36, appeal not allowed, 139 Ohio St.3d 1484, 2014-Ohio-3195, 12 N.E.3d 1230.

{¶33} Based upon the record of the instant case and the remedial goal of R.C. 2903.214, we find the trial court could reasonably have inferred Baleigh and her husband were afraid appellant would cause physical harm to one or both of them after the February 3 incident. This threat of physical harm, coupled with appellant's continued apparent inability or unwillingness to leave the Wilsons alone, permitted the trial court to reasonably find appellant knowingly caused the Wilsons to fear he would physically harm one or both of them. *Short v. Walker*, 12th Dist. Preble No. CA2000-08-009, 2001 WL 32808, *4 (Jan. 16, 2001), citing *Lindsay v. Jackson,* 1st Dist. Hamilton Nos. C-990786 and A-9905306, unreported, 2000 WL 1268810 (Sept. 8, 2000) and *Lain v. Ververis*, 12th Dist. Preble App. No. CA99-02-003, unreported, 1999 WL 893611 (Oct. 18, 1999); see also*, Kruszynski*, supra, 2013-Ohio-3355 at ¶ 22.

{¶34} Appellant's first assignment of error is overruled.

II.

{¶35} In his second assignment of error, appellant argues the trial court lacked authority to reject the settlement agreement. We disagree.

{¶36} We first note the proposed settlement agreement has not been proffered into the record. In reviewing assigned error on appeal we are confined to the record that was before the trial court as defined in App.R. 9(A). This rule provides that the record on appeal consists of "[t]he original papers and exhibits thereto filed in the trial court, the transcript of proceedings, if any, including exhibits, and a certified copy of the docket and journal entries prepared by the clerk of the trial court." App.R. 9(B) also provides in part " * * *[w]hen portions of the transcript necessary for resolution of assigned errors are omitted from the record, the reviewing court has nothing to pass upon and thus, as to

those assigned errors, the court has no choice but to presume the validity of the lower court's proceedings, and affirm." The appellant bears the burden of showing error by reference to matters in the record. *Knapp v. Edwards Laboratories*, 61 Ohio St.2d 197, 199, 400 N.E.2d 384 (1980).

{¶37} In this case, therefore, we do not have the terms of the settlement agreement as it appeared before the trial court. However, the trial court referred to terms of the agreement on the record in open court, including a provision appellant would not walk, drive, or otherwise pass in front of the Wilsons' house.

{¶38} Nevertheless, substantively we find the trial court did not err in refusing to enforce the agreement. An oral settlement agreement entered into in the presence of the court constitutes a binding contract. *Spercel v. Sterling Industries, Inc.*, 31 Ohio St.2d 36, 285 N.E.2d 324 (1972), paragraph one of the syllabus; *Mack v. Polson Rubber Co.*, 14 Ohio St.3d 34, 36, 470 N.E.2d 902 (1984). "[W]hen the parties agree to a settlement offer, this agreement cannot be repudiated by either party, and the court has the authority to sign a journal entry reflecting the agreement and to enforce the settlement." *Klever v. Stow*, 13 Ohio App.3d 1, 4, 468 N.E.2d 58 (9th Dist.1983). In this case, Baleigh's equivocation about her consent to the agreement, coupled with the trial court's disinclination to approve an unenforceable order, meant the court had no authority to sign the agreement or to enforce that agreement as a contract binding upon both of the parties.

{¶39} The Ohio Supreme Court concluded that "it is not within the province of the trial judge to enforce a purported settlement agreement when the substance or the existence of that agreement is legitimately disputed." *Rulli v. Fan Co.*, 79 Ohio St.3d 374, 376, 1997-Ohio-380, 683 N.E.2d 337 (1997). Where possible, it is generally within the

discretion of the trial judge to promote and encourage settlements to prevent litigation. Id., citing *In re NLO, Inc.* (C.A.6, 1993), 5 F.3d 154. A trial judge cannot, however, force parties into settlement. See id*.* The result of a valid settlement agreement is a contract between parties, requiring a meeting of the minds as well as an offer and an acceptance thereof. Id., citing *Noroski v. Fallet*, 2 Ohio St.3d 77, 79, 442 N.E.2d 1302 (1982). To constitute a valid settlement agreement, the terms of the agreement must be reasonably certain and clear. Id. These factors are absent from the proposed settlement agreement in the instant case.

{¶40} Here, the trial court noted its uneasiness with the terms of the settlement agreement because the proposed agreement was unenforceable. Appellant's counsel, the drafter of the agreement, acknowledged enforcement would require the Wilsons to file a new petition for civil protection order. Baleigh Wilson, in court, stated she did not agree with counsel's statement that the agreement resulted from the parties' agreement "the matter had gone too far and both parties wanted it resolved;" instead, she feared the settlement agreement might be the best outcome she could hope for if the trial court did not take the matter seriously.

{¶41} The trial court questioned the underlying facts of the February 3 incident and noted its concern about use of a firearm. Baleigh's stated reluctance, combined with the trial court's discomfort with the unenforceability of the purported agreement, means the trial court was well within its discretion to refuse to accept it. We note appellant has not presented any case law supporting its argument that the trial court abused its discretion in rejecting the terms of the settlement agreement under these circumstances.

{¶42} Appellant's second assignment of error is overruled.

**CONCLUSION**

{¶43} Appellant's two assignments of error are overruled and the judgment of the Knox County Court of Common Pleas is affirmed.

By: Delaney, J. and

Wise, P.J.

Baldwin, J., concur.